UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SGS NORTH AMERICA INC., a Delaware Corporation,<br><br>      Plaintiff,<br><br>          -against-<br><br>TIMOTHY QUINN, an individual, and the ARM GROUP INC., a California Corporation, and DOES 1-10, inclusive,<br><br>      Defendants. | Case No.  5:25-cv-1542 (AJB/MJK)<br><br>**COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF FOR:**<br><br>(1) **VIOLATION OF THE DEFEND TRADE SECRETS ACT;**<br>(2) **BREACH OF CONTRACT;**<br>(3) **BREACH OF THE DUTY OF LOYALTY;**<br>(4) **AIDING AND ABETTING BREACH OF THE DUTY OF LOYALTY; AND**<br>(5) **TORTIOUS INTERFERENCE WITH CONTRACT.**<br><br>**DEMAND FOR JURY TRIAL** |

SGS North America Inc., by and through its attorneys, Littler Mendelson, P.C., hereby complain of Defendants Timothy Quinn ("Quinn") and the Arm Group Inc. (the "Arm Group") (collectively, "Defendants"), upon information and belief, as follows:

## NATURE OF THE CASE

1.      This is an action based upon: (1) misappropriation of trade secrets under the Defend Trade Secrets Act (18 U.S.C. § 1836, et seq.); (2) breach of contract; (3) breach of the duty of loyalty; (4) aiding and abetting breach of the duty of loyalty; and (5) tortious interference with contract.

2.      Plaintiff SGS North America Inc. ("SGS"), through its business unit SGS Galson, employed Defendant Timothy Quinn as a Senior Project Manager from 2018 until 2025.  Quinn was responsible for leading SGS's sales efforts across North America for its sensor technology products, primarily those used for air quality monitoring. Unbeknownst to SGS at the time, in 2015

Quinn had created a company known as the Arm Group. It has now become clear that, prior to joining SGS, Quinn already intended the Arm Group to become a direct competitor of SGS in the field of air quality monitoring.

3.      SGS is a key regional member of the SGS Group, the world's largest testing, inspection, and certification ("TIC") company. SGS develops a wide range of advanced technologies to enhance its TIC services. These include SmartSense and AirSense, its innovative real-time environmental monitoring systems. SmartSense is designed for use in larger indoor spaces, such as industrial plants or warehouses, as well as outdoors, for smart city applications. AirSense is designed for business and retail environments, such as offices, hotels, restaurants and retail stores.

4.      While employed at SGS, Quinn misappropriated SGS's trade secrets and other confidential information related to its air quality monitoring business including technical information regarding its SmartSense sensor products, client lists, pricing information, and market analysis and sales strategies. A forensic examination of Quinn's SGS laptop computer following his termination showed that for months prior, he had been misappropriating this information by downloading it to USB devices and emailing it to his Arm Group email account.

5.      Twelve days following his termination by SGS, Quinn registered the website mysitesense.com, which used SGS's information to market the services of the Arm Group and to solicit customers for its air quality monitoring business, in direct competition with SGS. Quinn used SGS's information to advertise and market the expertise of the Arm Group, its SiteSense service, and other product offerings. As a result, SGS sent Quinn a cease-and-desist letter. He subsequently took down this website on or after August 25, 2025.

6.      SGS's forensic examination has further shown that Quinn exfiltrated its trade secret and confidential information in the months leading up to his termination.

7.      More recently, on September 29, 2025, SGS discovered that Quinn had launched a new website: aerisync.com. This new website also markets the services of the Arm Group and seeks to solicit customers for its air quality monitoring business. Quinn has now shown he will not voluntarily abandon his plan for the Arm Group to compete directly and unfairly with SGS. SGS now brings this action to protect its trade secrets and to enforce Quinn's contractual obligations under his confidentiality agreement with SGS.

## THE PARTIES

8.      SGS is a publicly held Delaware corporation, with its principal place of business and headquarters in Bloomfield, New Jersey.  In 2014, SGS acquired Galson Laboratories, which became SGS Galson Laboratories Inc. ("SGS Galson"), a wholly-owned subsidiary of SGS. SGS Galson was a Delaware corporation with its principal place of business and headquarters in East Syracuse, New York. In 2017, SGS Galson merged with its parent company SGS, becoming a business unit of SGS based in East Syracuse, New York.

9.      On information and belief, Timothy Quinn is a citizen of California with his residence at 49640 Rancho La Merced, La Quinta, CA 92253.

10.      On information and belief, the Arm Group is a California corporation with its principal place of business and headquarters at 49640 Rancho La Merced, La Quinta, CA 92253. Quinn is the Chief Executive Officer, Chief Financial Officer, Secretary, and Director of the Arm Group.

11.      From January 7, 2018, until February 10, 2025, Timothy Quinn was a Senior Project Manager for SGS. In 2023, SGS offered and Quinn accepted the position of Senior Product Manager with SGS based in East Syracuse, New York, and reporting to General Manager Lisa

Swab, also based in East Syracuse, NY. While Quinn's position for SGS was based in East Syracuse NY, he primarily worked from a home office in La Quinta, California.

12.     Unbeknownst to SGS during Quinn's employment, on February 9, 2015, Quinn had created a company known as the Arm Group. As of December 2024, Quinn was listed as the Arm Group's Chief Executive Officer, Chief Financial Officer, and Secretary. The Arm Group's office address was listed in La Quinta, California.  During his employment with SGS, Quinn worked to further his own business interests through the Arm Group, as further alleged below.

13.     The Arm Group is a California corporation also associated with the website mysitesense.com, which public records show Quinn registered on February 22, 2025—just 12 days after SGS terminated his employment.  The Arm Group is also associated with the website aerisync.com, which Quinn registered on July 15, 2025, after he received a letter from SGS demanding that he and the Arm Group immediately cease and desist from any further use or disclosure of SGS's information on the website mysitesense.com.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. section 1836(c) and supplemental jurisdiction over SGS's state law claims pursuant to 28 U.S.C. section 1367.  In addition, there is a separate basis for jurisdiction in that complete diversity exists between SGS and Defendants and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332.

15.     This Court has personal jurisdiction over Quinn and the Arm Group pursuant to N.Y. C.P.L.R. 302(a)(1), and under the alter ego doctrine as to the Arm Group because it is the mere instrumentality of Quinn.

16.     While working for SGS, Quinn was in regular contact with SGS's office in New York, including SGS employees responsible for sensor technology and for product orders. Quinn

submitted all his orders to SGS's office in New York, where sensor products were assembled and calibrated. These sensor products were routinely shipped to customers associated with Quinn from SGS's shipping center in New York. When Quinn accessed SGS's computer system, including to submit orders or to access company information, he connected to its servers located in New York. Quinn's customers at SGS included at least one New York customer, the Port Authority of New York and New Jersey. Quinn also travelled occasionally to SGS's office in New York.

17. On information and belief, the Arm Group is undercapitalized, has no separate bank accounts, and does not observe corporate formalities. On information and belief, Quinn commingled personal and corporate funds, and used corporate funds of the Arm Group for his personal use. The Arm Group was used by Quinn to misappropriate SGS's trade secret information, aid and abet the breach of his duty of loyalty to SGS, and tortiously interfere with his Restrictive Covenant and Confidentiality Agreement with SGS.

18. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in East Syracuse, New York.

## FACTS COMMON TO ALL CAUSES OF ACTION

### SGS and Its Business

19. SGS is the nation's leading provider of TIC services, helping clients in virtually every sector to reduce risk and improve productivity.

20. SGS is a key regional member of the SGS Group, the world's largest TIC company, represented in more than 130 countries by 210 affiliated companies.

21. SGS is comprised of operations in the United States, Canada and Mexico. Over the years, SGS has acquired numerous companies, both small and large, enabling it to extend the scope of its services.

**Galson Laboratories**

22.     Galson Laboratories ("Galson") was founded in 1970 by Allen Galson. Allen recognized the need for industrial hygiene services to help industry manage environmental and occupational health risks, so he assembled a team of chemists to help companies comply with the new Occupational Health and Safety Act (OSHA) and emerging environmental legislation. The company grew steadily, responding to the increased regulatory requirements with new technologies and methods to meet the more stringent standards.

23.     In July 2014, Galson was purchased by SGS SA, the parent of SGS, and became SGS Galson. In 2017, SGS Galson merged with its parent company SGS, becoming a business unit of SGS based in East Syracuse, New York.

**Quinn's Employment with SGS**

24.     Originally, Quinn was employed by Galson Laboratories. After SGS SA acquired Galson, Quinn became an employee of SGS.

25.     In 2023, Quinn requested and received approval to work part time with SGS's partner TerraBase. Thus, in December, 2023, SGS reduced the hours he was required to work to 32 hours per week, but Quinn continued to report to SGS General Manager Lisa Swab, based in East Syracuse, New York. The December 2023 offer letter noted that Quinn's position—"Sr. Product Manager"—would continue to be based in East Syracuse, NY.

**SGS'S CONFIDENTIAL AND TRADE SECRET INFORMATION**

**SGS has Developed Trade Secrets and Other Valuable, Confidential Information**

26.     SGS has invested significant time and money creating and compiling its trade secrets, including but not limited to those that are set forth below. SGS utilizes such trade secrets and other confidential information to differentiate SGS and its products from its competitors within the marketplace; they also describe and analyze SGS's marketing and sales strategies.

27.     SGS has expended and continues to expend considerable resources to: (a) develop competitive and unique technologies for their sensors used to analyze indoor air quality and other forms of industrial hygiene; (b) pioneer and introduce new sensor products with competitive and profitable pricing strategies; (c) market its brand and foster client goodwill by tracking and supporting the needs of its customers; and (d) train, motivate, and develop its sales force regarding its latest products and most up-to-date sales strategies.

28.     Individuals employed by SGS who are engaged in sales, especially those with access to SGS's trade secrets and other confidential information accessible on their internal systems—such as Quinn—become intimately knowledgeable of SGS's products, business, transactional data regarding customers, and SGS's cost and profit margins for each client.

29.     SGS trade secrets and confidential information have significant economic value to its competitors. Therefore, SGS has a legitimate business interest in keeping such information confidential, in maintaining its customer relationships, and in not allowing the information to be disclosed to competitors through improper means.

30.     Giving a competitor or other third party access to these trade secrets would result in irreparable harm to SGS by, for example, allowing its competitors to reap the benefits of the time and resources expended by SGS to develop, compile, and otherwise maintain the same, and to do so without investing the time, effort, and resources that SGS did.

**SGS's Efforts to Protect Its Trade Secret and Confidential Information**

31.     SGS takes the protection of its information very seriously and expends a considerable amount of time and money to keep its information secure.  At all relevant times, SGS has taken extensive and reasonable steps to protect the confidentiality of its trade secrets and other confidential information.  This includes:

a.   Storing SGS's confidential information on secured and password-protected electronic systems, which are accessible only to SGS's personnel or other authorized parties;

b.   Individuals who use SGS's computer system are required to use complex passwords and multifactor authentication to access the system.

c.   SGS's Governance, Risk Management, And Compliance department regularly conducts security audits and risk assessments to ensure the safety of SGS's confidential information.

d.   SGS's Code of Conduct contains provisions concerning the protection of SGS's confidential and proprietary information, the use of SGS's computer systems, and the monitoring of that use by SGS's IT department.

e.   SGS enforces least privilege access principles, only allowing certain employees access to its most confidential information, with multiple levels of authorization required.

f.   SGS's Restrictive Covenant and Confidentiality Agreement (or "RCCA"), which Quinn signed as more fully outlined below, contains covenants limiting the access, uploading, downloading, use, and disclosure of SGS's trade secret and confidential information. It further contains a covenant requiring the return of SGS's property, trade secret and confidential information, upon termination of employment.  The SGS RCCA that Quinn signed is attached hereto as **Exhibit A.**

### Quinn's Creation of the Arm Group, Inc.

32.   SGS employed Quinn from 2018 until 2025. Prior to joining SGS, on February 9, 2015, Quinn had created a company called the Arm Group, Inc. At the time of its creation, Quinn

was listed as the "agent" for the Arm Group. As of December 2024, while he was still employed as a Senior Project Manager for SGS, Quinn changed his listing to the CEO, CFO, and Secretary of the Arm Group. SGS was unaware of the Arm Group during the time it employed Quinn. It has now become clear that Quinn intended for the Arm Group to be a direct competitor of SGS in the field of air quality monitoring. Indeed, as described below, following Quinn's termination the Arm Group now competes directly with SGS in the field of air quality monitoring.

33.    Air quality monitoring was Quinn's primary focus in his role as Senior Project Manager for SGS. On information and belief, one of Quinn's purposes in accepting the position of Senior Product Manager at SGS was to gain access to SGS's trade secrets and other confidential information, so that he could leverage SGS's investment in its trade secrets to unfairly compete with them in the field of air quality monitoring.

**Forensic Examination Reveals Defendants' Wrongdoing**

34.    Following Quinn's termination, SGS engaged a third-party vendor to conduct a forensic examination of his company-issued laptop. This examination revealed that Quinn, in contravention of his contractual obligations, had connected various USB devices to his SGS laptop computer and transferred onto these devices SGS's trade secrets and other confidential information.

35.    Several of the files Quinn copied onto USB devices related specifically to SGS's SmartSense technology.

36.    For example, on July 7, 2024, Quinn used a USB device (S/N 372736AC23230161) to create, copy, store and/or transfer SGS information on his SGS laptop computer:

| Timestamp (PST/PDT) | Event Type | File Path |
|---|---|---|
| 07/07/2024 10:26:45 AM | File Created | D:\Pics.docx |
| 07/07/2024 10:21:13 AM | File Created | D:\Boston.Out.jpg |
| 07/07/2024 10:19:34 AM | File Created | D:\SmartSense.Monitor.jpg |
| 07/07/2024 10:18:54 AM | File Created | D:\SS.O&G.jpeg |
| 07/07/2024 09:51:24 AM | File Created | D:\New.Success.pdf |

37.    As a further example, on February 10, 2025, Quinn accessed the documents below during the time that a USB drive was connected to his SGS laptop (i.e., between 12:30-12:39 p.m. on February 10, 2025). Quinn subsequently downloaded these documents onto the USB drive. Given that Quinn was terminated on February 10, 2025, he had no legitimate reason to access the below-referenced documents that same day:

*Files on Desktop with metadata consistent with copy to USB:*

| Path | Created | Last Accessed | Last Written |
|---|---|---|---|
| C:\Users\Timothy_Quinn\Desktop\2025 Amazon Pricing Matrix - AUS.xlsx | 01/30/2025 08:46:33 | 02/10/2025 12:31:57 | 02/06/2025 07:54:06 |
| C:\Users\Timothy_Quinn\Desktop\Updated.Address.2.7.25.csv | 02/07/2025 13:19:27 | 02/10/2025 12:30:16 | 02/07/2025 13:30:22 |

(highlighting added)

38.    Amazon is a key client of SGS. The document titled "2025 Amazon Pricing Matrix.AUS.xlsx" was created on January 30, 2025, and appears to contain pricing data for Amazon. The document titled "Updated.Address.2.7.25.csv" was created on February 7, 2025, and appears to contain contact information for Amazon. Again, there was no legitimate reason for Quinn to have created and accessed these files on or leading up to the date of his termination.

39.    Quinn was not authorized to copy any of SGS's data to a USB device for any non-SGS business purpose. Moreover, SGS is informed and believes that the USB devices Quinn connected to his SGS laptop computer could contain more of SGS's data, but since Quinn did not return these devices to SGS at the termination of his employment, as he was contractually obligated to do, SGS is currently unable to identify all of its data contained on the devices. Further, SGS's forensic examination has confirmed that Quinn likely used at least one other USB device to create, copy, store and/or transfer SGS information on his SGS laptop computer.

40.    SGS's forensic examination of Quinn's SGS laptop computer further revealed that a folder titled "Amazon PO's" previously existed within Quinn's user profile on SGS's systems. It contained nine Amazon Purchase orders that were all downloaded by Quinn on January 13,

2025. This "Amazon PO's" folder no longer exists and was not recoverable from previously existing data.

41.    SGS's forensic examination of Quinn's SGS laptop computer further revealed that Quinn created files on his laptop that contained SGS's trade secret and other confidential information.

42.    For example, on January 9, 2025, Quinn opened a file he had created titled "New Passwords.doc".  This was a document containing credentials for five different SGS accounts, including Amazon. Specifically, the document contained passwords to SGS accounts for Delos, Amazon, Boston Public Schools, and USA-WS.

43.    As a further example, Quinn created the file titled "Project_Sequoia_Site_List (12.20)(1).xlsx". This was a spreadsheet containing an SGS client list, along with pricing information for each client. Notably, under the "SGS List" tab, Quinn created a column titled "Sites that SGS Has that We Do Not." This demonstrates Quinn's intent to identify SGS's customer sites and move that work to his own company:



44.    The above screenshot is just a portion of the data contained in this spreadsheet. The spreadsheet contains many other rows below the last row shown. On information and belief, Quinn transferred this file from his SGS laptop computer to his own control prior to his termination by SGS.

45.    SGS's forensic examination of Quinn's SGS laptop computer further revealed that Quinn, in contravention of his contractual obligations, had sent multiple emails from his SGS work email account to his Arm Group email account, timq@armgroupinc.com. These emails contained or attached SGS's trade secrets and other confidential information. Quinn began sending these emails on August 12, 2024, and continued sending them through January 23, 2025.

46.    For example, during Quinn's employment with SGS, he sent the following emails from his SGS work email account to his Arm Group email account:

a.    On August 12, 2024, Quinn emailed from his SGS account to his Arm Group account a document titled "Escape methane market.8.12.24.pdf". This document is an SGS technical presentation related to the market for air quality monitoring.

b.    On August 12, 2024, Quinn emailed from his SGS account to his Arm Group account a document titled "Simple Market Analysis." This document appears to contain intelligence developed by SGS to assess markets for its products and drive sales strategy.

c.    On August 13, 2024, Quinn emailed from his SGS account to his Arm Group account a document titled "Document1.docx." This is a screenshot from SGS's customer relationship management platform, used to track the needs and contact information of its customers.

d.   On August 22, 2024, Quinn emailed from his SGS email account to his Arm Group account a document titled "NevadaNano.Slides.docx."  This contains screenshots from an SGS meeting with MPS Smart Sensor Module, an SGS partner.

e.   On August 26, 2024, Quinn emailed from his SGS account to his Arm Group account a document titled "FW: [EXTERNAL] John Holt shared 'SIBA-AGC Proposal.pdf.'" This is a proposal to a potential SGS customer.

f.   On September 5, 2024, Quinn emailed from his SGS account to his Arm Group account a document titled "UCSD.1.jpg."  Quinn also sent a similar email attaching a document titled "UCSD.3.jpg." These are photos taken by Quinn of work product from SGS client sites.

g.   On September 16, 2024, Quinn emailed from his SGS account to his Arm Group account an email with the subject line "Examples", attaching a document titled "SS.Pic.Hosp.2.jpg, UCSD.3.jpg." These are additional photos taken by Quinn of work product from SGS client sites.

h.   On December 10, 2024, Quinn emailed from his SGS account to his Arm Group account attachments titled "heating element 1.jpg, heating element 2.jpg, heating element 3.jpg" These are photos of SGS's SmartSense sensor showing details of its interior components.

47.   On February 22, 2025, just 12 days after his employment was terminated by SGS, Quinn registered the website mysitesense.com ("SiteSense Website"). The SiteSense Website used SGS's trade secrets and other confidential information to market the services of Arm Group and

to solicit customers in direct competition with SGS.  Moreover, the name "SiteSense" is clearly derivative of two of SGS's air quality monitoring products: SmartSense and AirSense.

48.     Not only was creating the Arm Group in contravention of Quinn's duty of loyalty owed to SGS, but the SiteSense website demonstrates Quinn's use of SGS's trade secret and other confidential information to market the services of the Arm Group and to solicit customers in direct competition with SGS.

49.     For example, below is a screenshot from the SiteSense Website displaying a data set from SGS



As a further example, below is another screenshot from the SiteSense Website displaying a data set from SGS related to schools in a Boston school district. The school district worked with SGS to put air quality sensors in Boston classrooms. This data set was previously displayed on SGS's website. While it may be difficult to see in this document, the screen shot still bears an SGS logo. SGS did not give Quinn permission to display its data on any non-SGS website.



**SGS's Efforts to Get Its Intellectual Property Back**

50.    On June 18, 2025, SGS sent Quinn a letter demanding that he and the Arm Group immediately cease and desist from any further use or disclosure of SGS's non-public information. In the letter, SGS laid out the details of the forensic examination it had conducted of Quinn's SGS laptop computer, including the SGS trade secret and confidential information that he had downloaded to USB devices and emailed to his Arm Group email account. SGS demanded that Quinn comply with his contractual obligation to return all SGS's trade secret and confidential information in his possession. SGS further demanded that Quinn identify his devices and accounts used to download SGS's non-public information and cooperate in a forensic examination of those devices and accounts.

51.    On June 25, 2025, Eric Yaeckel of the law firm of Sullivan & Yaeckel responded on behalf of Quinn, noting that his office "has just been retained by Mr. Quinn."  Implying that he was taking SGS's demand letter seriously, he wrote: "I need some time to come up to speed on this matter and to meet in person with my client."  He stated he would respond to SGS's June 18

demand letter by July 1, 2025. Believing Mr. Yaeckel and Quinn to be operating in good faith, SGS allowed him that time, expecting that he would advise Quinn to comply with SGS's demands regarding the protection of its intellectual property.

52.    Instead of providing a substantive response to SGS's detailed allegations and forensic findings against Quinn, Quinn's counsel used that time to prepare and send to SGS's counsel a six-page letter consisting mostly of boilerplate assertions that Quinn's SGS confidentiality agreement was unenforceable and contained provisions violating the California Business & Professions Code's prohibition against noncompete agreements. He further threatened to bring a wage and hour class action based on these assertions. Mr. Yaeckel then demanded a response to his letter by July 8. All the while, Quinn continued to possess SGS's trade secret and confidential information, while refusing to comply with his contractual obligation to return it.

53.    On July 3, 2025, SGS responded to Mr. Yaeckel's letter, expressing its disappointment that Quinn had provided no substantive response to its demand that he stop using and return to SGS their trade secret and confidential information. SGS also disavowed Quinn of the legal theories supporting any purported wage/hour class action allegations.

54.    In response, on July 11, 2025, Quinn's lawyer sent a letter to the California Labor and Workforce Development Agency, a requirement to exhaust his administrative remedies before filing a type of wage and hour representative action. In the letter, Quinn asserted traditional wage and hour claims based on the theory that he had been misclassified at SGS as exempt from overtime. Quinn subsequently filed a wage and hour class action complaint in Southern California.

**Quinn Continues To Use SGS's Trade Secret And Confidential Information**

55.    Following SGS's demand letter, Quinn appeared to have taken down the SiteSense Website on or after August 23, 2025. As of the date of this Complaint, it is no longer accessible to

the public. Rather than abandon his plan to compete unfairly with SGS, however, Quinn simply changed tack.

56.     On July 15, 2025, Quinn registered the website aerisync.com ("Aerisync Website"). Unlike the SiteSense Website, Quinn's Aerisync Website does not overtly use SGS's trade secrets and other confidential information to market the services of Arm Group. However, like Quinn's earlier SiteSense Website, his Aerisync Website also competes directly with SGS in the field of air quality monitoring. For example, it promotes "Indoor and outdoor air quality monitors built with precision sensor arrays for accurate readings in any setting", and promises that "ARM Group Inc, a minority-owned California-based company, delivers cutting-edge air quality monitoring solutions". https://aerisync.com (last visited October 7, 2025).

57.     Quinn has now shown he will not voluntarily abandon his plan for the Arm Group to compete directly with SGS for its air quality business. Furthermore, on information and belief, Quinn is continuing to use SGS's trade secrets and confidential information to compete with SGS and to solicit customers for the Arm Group. Based on the forensic evidence uncovered from Quinn's SGS laptop to date, SGS are deeply concerned that he currently possesses SGS's trade secret and other confidential information, including but not limited to technical information regarding its sensor products, client lists, pricing information, and market analysis and sales strategies.

58.     SGS has sought to engage with Quinn in good faith discussions to resolve his use and continued possession of SGS's trade secret and confidential information, which he had downloaded to USB devices and emailed to his Arm Group email account. Instead of engaging with SGS to resolve these issues without court intervention, Quinn went ahead and filed a baseless wage/hour representative suit in Southern California, thousands of miles from his employment

with SGS in East Syracuse. SGS has never backed off its rights and will continue to assert them in the face of the sharp tactics employed by Quinn and his wage/hour lawyers.

59.    SGS now brings this action to protect its trade secrets and to enforce Quinn's contractual obligations under his confidentiality agreement with SGS. While SGS had sought compliance from Quinn without the need for court intervention, he has now forced SGS's hand by filing his baseless wage/hour representative suit. Quinn should be required to answer for his misdeeds, including by disgorging the money that he was paid by SGS while breaching his duty of loyalty, and disgorging the monies and profits he has made on the back of SGS's intellectual property.

## <u>FIRST CAUSE OF ACTION</u>

**Misappropriation Under the Defend Trade Secrets Act**
**(18 U.S.C. § 1836 et seq.)**
**(Against Quinn and the Arm Group)**

60.    SGS realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

61.    SGS owns and possesses trade secret information as set forth above, including documents containing confidential and valuable information regarding technical information for its sensor products, client lists, pricing information, and market analysis and sales strategies. While SGS's investigation has been limited by Quinn's refusal to return SGS's information and cooperate in a forensic examination of his devices and accounts by a neutral third-party forensics firm, information currently available to SGS shows that as of the date of this Complaint, Quinn misappropriated at least the following trade secrets:

a.    Confidential data that SGS compiled into a technical presentation. *See supra* at Paragraph 46(a) (referencing a document titled "Escape methane market.8.12.24.pdf" that is not shared with the public and that Quinn

emailed from his SGS account to his Arm Group account on August 12, 2024).

b.    Intelligence developed by SGS to assess markets for their products and drive sales strategy. *See supra* at Paragraph 46(b) (referencing document titled "Simple Market Analysis" that Quinn emailed from his SGS account to his Arm Group account on August 12, 2024).

c.    Confidential information from SGS's customer relationship management platform, used to track the needs and contact information of SGS's customers. *See supra* at Paragraph 46(c) (referencing a document titled "Document1.docx" that Quinn emailed from his SGS account to his Arm Group account on August 13, 2024).

d.    Confidential notes from a meeting with a strategic partner of SGS. *See supra* at Paragraph 46(d) (referencing a document titled "NevadaNano.Slides.docx." that Quinn emailed from his SGS account to his Arm Group account on August 22, 2024).

e.    Confidential information related to SGS's SmartSense technology. *See supra* at Paragraph 46(h) (referencing a downloaded document titled SmartSense.Monitor.jpg and emailed photos of a SmartSense sensor showing details of its interior components).

f.    Compilations of pricing data, purchase orders, and updated contact information for SGS's key client Amazon that Quinn downloaded on January 13, 2025 and February 10, 2025. *See supra* at Paragraphs 38-40

(referencing files titled "Amazon POs" and "2025 Amazon Pricing Matrix - AUS.xlsx" and "Updated.Address.2.7.25.csv").

g.      Nonpublic client lists with nonpublic pricing data, including notes on SGS's client sites indicating which were not serviced by Quinn's company.  *See supra* at Paragraph 43 (referencing the Excel-based file Quinn created titled "Project_Sequoia_Site_List (12.20)(1).xlsx").

62.    This information at issue in this case was created by SGS at significant expense and developed over the course of many years.

63.    SGS's trade secret information is highly valuable as a result of its efforts to keep this information confidential and out of the hands of third parties, and SGS will suffer irreparable harm from the use and disclosure of their information, including loss of business and loss of competitive advantage.

64.    SGS has taken reasonable steps to protect the secrecy of its trade secrets, including those listed in Paragraph 31, above.

65.    Quinn and the Arm Group misappropriated SGS's trade secret information in the improper and unlawful manner described in Paragraphs 34 to 49, above.

66.    Quinn and the Arm Group had no legitimate business reason to take SGS's trade secret information.

67.    On information and belief, Quinn and the Arm Group will continue to misappropriate, disclose, and use SGS's trade secret information for their own benefit, and to SGS's detriment, unless they are enjoined from doing so.

68.    Because SGS's remedy at law is inadequate and it will suffer irreparable harm, SGS seek—in addition to damages—a preliminary injunction and a permanent injunction to protect its

trade secret information and legitimate business interests.  SGS will continue to suffer irreparable harm absent injunctive relief.

69.     Quinn and the Arm Group's misappropriation of SGS's trade secret information has caused and will continue to cause SGS substantial injury, including but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets. Defendants have also been unjustly enriched by their misappropriation of SGS's trade secrets.

70.     Defendants' misappropriation of SGS's trade secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive, within the meaning of the DTSA, 18 U.S.C. § 1836(b)(3)(C)-(D). Defendants misappropriated SGS's trade secrets intentionally and knowingly and with a deliberate intent to benefit from them and to injure SGS.  SGS is entitled to damages, in an amount to be determined at trial, as well as injunctive relief, and an award of exemplary and/or treble damages and attorney's fees pursuant to the DTSA.

## SECOND CAUSE OF ACTION

### Breach of Contract
### (Against Quinn)

71.     SGS realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

72.     On November 30, 2023, in consideration of his continued employment by SGS, Quinn signed SGS's Restrictive Covenant and Confidentiality Agreement ("RCCA").

73.     The RCCA is clear that any trade secret and confidential information Quinn created while employed by SGS remains the sole property of SGS:

> e.    **Company Property**. Employee acknowledges and agrees that all Trade Secrets and Confidential Information developed, created or maintained by Employee, alone or with others, while Employee is employed by the Company, shall remain at all times the sole property of the Company … and Employee shall not take and fail to return such information after termination of Employee's employment with the Company for any reason.

74.    The RCCA strictly prohibits Quinn from sending SGS's trade secrets and confidential information to a personal email account, or removing from SGS's premises any electronic copy of its trade secret and confidential information:

> f.    **Safeguarding of Company's Property & Information**. Employee is strictly prohibited, at all times during Employee's employment with the Company except with prior written approval of the Company's Managing Director, **from forwarding from Employee's Company email account to Employee's personal email account(s) any emails or documents containing any Company Trade Secrets and/or Confidential Information**, as well as from copying, transferring or uploading to Employee's personal Cloud-based or online storage accounts such as a personal Dropbox or Google Docs account any documents containing any Company Trade Secrets and/or Confidential Information. Employee is also strictly prohibited, at all times during Employee's employment with the Company except with the express or implicit authorization of the Company, and then only for the sole benefit of the Company during the term of employment, from **removing from the premises of the Company any physical item or document, or any written, electronic or recorded copy of any physical item or document, containing or embodying any Company Trade Secrets and/or Confidential Information**, including without limitations the same in electronic or digital form.

(Bolding added for emphasis.)

75.    The RCCA defines "Confidential Information":

> b.    **Definition of "Confidential Information**." … all information belonging to the Company, whether reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, and whether the information is simply in Employee's head, that has been provided to Employee during Employee's employment with the Company and/or Employee has gained access to while employed by the Company and/or was developed by Employee in the course of Employee's employment with the Company, that is proprietary and confidential in nature …

76.    Based on the results of SGS's investigation to date, including its forensic examination of Quinn's SGS laptop computer, when Quinn sent SGS's confidential information to his personal Arm Group email account he breached Sec. 1(f) of the RCCA.  Separately, when Quinn used USB devices to copy, download, upload, store and/or transfer SGS's confidential

information (*see* Paragraphs 35-41, *supra*), then removed those devices from SGS's premises, Quinn also breached Sec. 1(f) of the RCCA. Finally, when Quinn failed to return SGS's confidential information following termination of his employment, he breached Sec. 1(e) of the RCCA.

77.     Quinn's performance of these contractual provisions was not excused, and SGS had performed all duties under the RCCA that it was required to perform.

78.     As a direct and proximate result of Quinn's breaches, SGS has suffered damage, in an amount to be proven at trial.  Further, SGS will continue to be directly and proximately damaged and irreparably harmed if Quinn is not enjoined from further violation of his contractual obligations to SGS, directed to comply therewith, and prohibited from possessing, using, or disclosing SGS's trade secrets and confidential information.  SGS does not have an adequate remedy at law and will not be fully compensated for Quinn's breaches without injunctive relief.

### THIRD CAUSE OF ACTION

**Breach of the Duty of Loyalty**
**(Against Quinn)**

79.     SGS realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

80.     As an employee of SGS, Quinn owed SGS an undivided duty of loyalty.  As a result, Quinn was obligated to act with the utmost good faith and in the best interest of SGS.

81.     SGS was entitled to place their trust and confidence in Quinn, and was entitled to expect Quinn to act with the utmost good faith toward it in carrying out SGS's business.

82.     SGS did rely on Quinn's loyalty and integrity and the faithful performance of his job duties and responsibilities.

83. Through the actions set forth above, Quinn knowingly and willingly breached his common law duties of loyalty to SGS. For example, before he was employed by SGS, Quinn formed a competing company—the Arm Group. Quinn never revealed the existence of the Arm Group to SGS. While he was employed by SGS, Quinn worked to favor the interests of the Arm Group over those of his employer.

84. This claim is not predicated on the misappropriation or theft of any confidential, proprietary, and/or trade secret information belonging to SGS. Rather, it is predicated on Quinn's deceit and breach of his duty of loyalty.

85. As a direct and proximate result of Quinn's breach of his duty of loyalty, SGS has been and is being harmed and faces irreparable injury.

86. SGS is entitled to and hereby seek damages, in an amount to be determined at trial, as well as disgorgement by Quinn of the salary, benefits, and other forms of remuneration paid to him during the time that he was, in secret, being disloyal to SGS, and all profits he received or will receive as a result of this disloyalty, in an amount to be determined at trial. SGS is further entitled to injunctive relief against Quinn to remedy his past improper conduct and prevent further irreparable harm to SGS.

87. Quinn's actions were done with malice, fraud, oppression, and reckless disregard of the above-described rights of SGS. For example, Quinn hid from SGS that he had previously created a competing company and sought to benefit his own company while employed by and receiving remuneration from SGS. Therefore, SGS seeks and is entitled to recover punitive damages from Quinn.

## FOURTH CAUSE OF ACTION

**Aiding and Abetting Breach of the Duty of Loyalty**
**(Against the Arm Group)**

88.    SGS realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

89.    As an employee of SGS, Quinn owed SGS an undivided duty of loyalty.  As described above, Quinn breached his duty of loyalty to SGS.

90.    The Arm Group had actual knowledge of Quinn's breach of his duty of loyalty to SGS, including by being the recipient of emails sent by Quinn from his SGS work email account to his Arm Group email account, timq@armgroupinc.com, that contained SGS's trade secret and confidential information.

91.    The Arm Group knowingly induced Quinn's breach of his duty of loyalty by providing him with a company email address to which he could send SGS's trade secret and confidential information, and allowing him to exfiltrate it for his own benefit and for the benefit of the Arm Group.

92.    As a direct and proximate result of the Arm Group's aiding and abetting Quinn's breach of his duty of loyalty, SGS has been and is being harmed and faces irreparable injury.

## FIFTH CAUSE OF ACTION

**Tortious Interference With Contract**
**(Against the Arm Group)**

93.    SGS realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

94.    On November 30, 2023, Quinn entered into a Restrictive Covenant and Confidentiality Agreement with SGS.

95.     The Arm Group was aware of Quinn's contract with SGS by virtue of Quinn's role as the CEO, CFO, and Secretary of the Arm Group.

96.     The Arm Group induced or otherwise caused Quinn not to perform his contract with SGS by providing him with a company email address to which he could send and did send SGS's confidential information; by providing financial incentives for Quinn to steal SGS's confidential information; and by providing Quinn with the means by which to monetize the confidential information he stole by using it to solicit SGS's customers for the Arm Group.

97.     Quinn breached Secs. 1(e) and 1(f) of the RCCA, including by sending SGS's confidential information to his personal Arm Group email account; by removing from SGS's premises USB devices to which he had copied, downloaded, uploaded, stored and/or transferred SGS's confidential information; and by failing to return SGS's confidential information following termination of his employment.

98.     Quinn's performance of these contractual provisions was not excused, and SGS had performed all duties

99.     As a direct and proximate result of the Arm Group's intentional interference with Quinn's Restrictive Covenant and Confidentiality Agreement with SGS, SGS has suffered damage, in an amount to be proven at trial.  Further, SGS will continue to be directly and proximately damaged and irreparably harmed if the Arm Group is not enjoined from further interference with Quinn's contractual obligations to SGS. SGS does not have an adequate remedy at law and will not be fully compensated for the Arm Group's interference with Quinn's contract without injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, SGS prays for judgment in its favor and against Defendants, as follows:

1.      For compensatory damages, according to proof;

2.     For exemplary and punitive damages, including damages and/or reasonable royalty awardable (the latter being awardable under the DTSA), according to proof;

3.     For injunctive relief;

4.     For restitution and/or disgorgement of profits;

5.     For attorney fees under 18 U.S.C. § 1836(b)(3)(D);

6.     For costs of suit incurred herein;

7.     For a trial by jury; and

8.     For such other and further relief as the Court may deem proper.

## **DEMAND FOR JURY TRIAL**

SGS respectfully demands a trial by jury of all causes of action so triable.

Dated:  October 31, 2025
    Fairport, New York       LITTLER MENDELSON, P.C.

             By: */s/ Jessica Pizzutelli*
              Jessica Pizzutelli, Bar Roll 520090
              JPizzutelli@littler.com
              LITTLER MENDELSON, P.C.
              375 Woodcliff Drive, Suite 2D
              Fairport, NY 14450
              Telephone:  585.203.3400
              Facsimile:  585.203.3414

              Mark A. Romeo, CA Bar No. 173007
              mromeo@littler.com
              LITTLER MENDELSON, P.C.
              18565 Jamboree Road, Suite 800
              Irvine, California 92612
              Telephone:  949.705.3000
              Facsimile:  949.724.1201
              *(Pro Hac Vice Pending)*

              Neil Cave, NY Bar No. 4205969
              ncave@littler.com
              LITTLER MENDELSON, P.C.
              101 Second Street, Suite 1000
              San Francisco, California 94105
              Telephone:  415.433.1940
              Facsimile:  415.399.8490