**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

SGS NORTH AMERICA INC.,

Plaintiff,

-v- 5:25-CV-1542 (AJB/MJK)

TIMOTHY QUINN *et al*.,

Defendants.

**Hon. Anthony Brindisi, U.S. District Judge:**

## DECISION & ORDER

## I. INTRODUCTION

At bottom, this action concerns the alleged misappropriation of SGS North America Inc.'s ("plaintiff" or "SGS") purported trade secrets and other confidential information by its former employee, defendant Timothy Quinn ("Quinn"), and defendant Arm Group ("Arm Group"), Quinn's company (collectively, "defendants").[1]

Plaintiff's complaint alleges state-law claims for breach of contract ("Count II") and breach of the duty of loyalty ("Count III") against Quinn, tortious interference with contract ("Count V") and aiding and abetting breach of the duty of loyalty ("Count IV") against the Arm Group, and

[1] Plaintiff's complaint also names "Does 1–10" as defendants in the case caption; however, it makes no allegations against them. Compl., Dkt. No. 1 at 1 ("SGS North America Inc., by and through its attorneys, Littler Mendelson, P.C., hereby complain of Defendants Timothy Quinn ("Quinn") and the Arm Group Inc. (the "Arm Group") (*collectively, "Defendants"*)[.]") (emphasis added). As a result, Does 1–10 are *sua sponte* dismissed from this action. *See, e.g.*, *White v. Mielnicki*, 2021 WL 12188656, at *4 (N.D.N.Y. Sept. 9, 2021) ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff.") (quoting *Cipriani v. Buffardi*, 2007 WL 607341, at *1 (N.D.N.Y. Feb. 20, 2007)).

misappropriation of trade secrets in violation of the federal Defend Trade Secrets Act ("Count I") against both defendants. Compl., Dkt. No. 1 ¶¶ 60–99. Before the Court are defendants' motions to dismiss for lack of personal jurisdiction, improper venue, and for failure to state a claim or, in the alternative, to transfer this matter to the Central District of California.

For the reasons that follow, defendants' motions to dismiss for improper venue and to transfer venue are **DENIED**. Defendants' motion to dismiss for lack of personal jurisdiction is **DENIED** as to Quinn but **GRANTED** as to the Arm Group; therefore, all claims against the Arm Group ("Counts I, IV, and V") are **DISMISSED** without prejudice. Defendants' motion to dismiss the remaining claims against Quinn for failure to state a claim is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's claims for breach of the duty of loyalty ("Count III") and DTSA misappropriation ("Count I") are **DISMISSED** without prejudice.

## II. BACKGROUND

Plaintiff SGS North America Inc. ("SGS"), a Delaware corporation with its principal place of business in Bloomfield, New Jersey, is a "testing, inspection and certification ('TIC') company" that develops "a wide range of advanced technologies" for those unspecified ends. Compl. ¶ 3. One field in which SGS operates is "air quality monitoring," where it offers "real-time environmental monitoring systems," such as "SmartSense" for use outdoors and in larger indoor spaces, and "AirSense" for business and retail environments. *Id.* ¶¶ 2–3.

Defendant Timothy Quinn ("Quinn"), a citizen and resident of California, was employed as a Senior Project Manager for plaintiff from January 7, 2018, until February 10, 2025. Compl. ¶¶ 9, 11. In 2015, prior to his employment with plaintiff, Quinn created the defendant company, the Arm Group ("Arm Group"). *Id.* ¶ 12. The Arm Group is a California corporation with its principal place of business and headquarters in La Quinta, California. *Id.* ¶ 10. As of December

2024, Quinn was listed as the Arm Group's CEO, CFO, and secretary. *Id.* ¶ 12. According to the complaint, plaintiff was unaware of the Arm Group's existence during the time it employed Quinn. *Id.* ¶ 32.

Plaintiff alleges a series of instances between 2024 and 2025 in which Quinn sent SGS's trade secret and confidential information from his work email address to his Arm Group email address, or otherwise "copied, downloaded, uploaded, stored and/or transferred SGS's confidential information" to his personal devices. *See* Compl. ¶¶ 58, 97.

As a condition of his employment, Quinn signed a Restrictive Covenant and Confidentiality Agreement ("RCCA" or "Agreement"), which, among other things, barred him from removing plaintiff's information except as necessary to perform his employment duties, and required that he return all of plaintiff's information upon termination of his employment. Compl. ¶¶ 73–75; *see also* RCCA, Dkt. No. 1-1. Plaintiff asserts that "following Quinn's termination the Arm Group now competes directly with SGS in the field of air quality monitoring." Compl. ¶ 32.

Plaintiff filed its complaint on October 31, 2025. *See generally* Compl. On November 26, 2025, defendants moved to dismiss for lack of personal jurisdiction, improper venue, and for failure to state a claim and moved alternatively to transfer this matter. Defs.' Mot., Dkt. No. 12-1. On December 17, 2025, plaintiff filed its opposition. Pl.'s Resp., Dkt. No. 21. Defendants did not submit a reply. On July 8, 2026, the Court heard oral argument. The motions are now ripe for disposition.

## III. DISCUSSION

### A. Defendants' Rule 12(b)(2) Motion

#### 1. Applicable Law

Rule 12(b)(2) authorizes a defendant to move for pre-answer dismissal of a pleading for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). "The plaintiff's jurisdictional allegations 'are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor.'" *Dow Jones & Co., Inc. v. Perplexity AI, Inc.*, 797 F. Supp. 3d 305, 318 (S.D.N.Y. 2025) (quoting *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 341 (S.D.N.Y. 2015)).

"In deciding a pretrial motion to dismiss for lack of personal jurisdiction, a district court has considerable procedural leeway." *Fish v. Oshkosh Def., LLC*, 2023 WL 12023144, at *5–6 (N.D.N.Y. Nov. 13, 2023) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). A court may determine the motion based on "affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Marine Midland Bank, N.A.*, 664 F.2d at 904).

#### 2. Analysis

The Court first considers whether it has personal jurisdiction over Quinn before turning to the Arm Group. Plaintiff asserts the Court has personal jurisdiction over Quinn and the Arm Group pursuant to New York Civil Practice Law and Rules ("CPLR") § 302(a)(1). *See* Compl. ¶ 15.

**(i) Quinn**

**(a) CPLR § 302(a)(1)**

Section 302 "is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (N.Y. 1988)).

"For § 302(a)(1), the 'jurisdictional inquiry is twofold: under the first prong the defendant must have conducted sufficient activities to have transacted business in the state, and under the second prong, the claims must arise from the transactions.'" *Am. Girl, LLC v. Zembrka*, 118 F.4th 271, 276–77 (2d Cir. 2024) (quoting *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323 (N.Y. 2016)).

(1) *"Transacting Business" within New York*

"'[T]he overriding criterion necessary to establish a transaction of business within the meaning of § 302(a)(1) is that a non-domiciliary must commit an act by which it purposefully avails itself of the privilege of conducting activities within New York,' 'thus invoking the benefits and protections of its laws.'" *Khan v. Sedicii Innovations Ltd.*, 2026 WL 2097871, at *2 (2d Cir. July 21, 2026) (summary order) (quoting *American Girl, LLC*, 118 F.4th at 277) (internal alterations omitted).

"Not all purposeful activity, however, constitutes a 'transaction of business' within the meaning of N.Y. C.P.L.R. § 302(a)(1)." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 62 (2d Cir. 2012) (quoting *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (N.Y. 2007) (internal alterations omitted)). "[I]t is not the quantity but the quality of the contacts that matters under [the] long-arm jurisdiction analysis[.]" *Ascent Aerosystems Inc. v. Trost*, 2026 WL 504550, at *8

(N.D.N.Y. Feb. 24, 2026) (quoting *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 378 (N.Y. 2014)). "When making this assessment, courts look to the 'totality of the circumstances.'" *Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 253 (S.D.N.Y. 2020) (citing *Licci ex rel. Licci*, 673 F.3d at 62).

Plaintiff offers a string cite of cases accompanied by parenthetical characterizations or excerpts that do not address the "transacts business" prong specifically. In failing to do so, plaintiff collapses or otherwise disregards the two-step analysis of Section 302(a)(1) and speaks largely in binary terms: whether a court found personal jurisdiction or not. Here's the relevant part of plaintiff's brief:

> Mr. Quinn's contacts with New York are more than sufficient to establish personal jurisdiction. *Medicrea USA, Inc. v. K2M Spine, Inc.*, No. 17 CIV. 8677 (AT), 2018 WL 3407702, at *5 (S.D.N.Y. Feb. 7, 2018) (finding personal jurisdiction over out-of-state salespeople who were "in regular contact with [former employer] Medicrea's New York office and its engineers");*Olympus Am., Inc. v. Fujinon, Inc.*, 8 A.D.3d 76, 77 (2004) (finding personal jurisdiction over out-of-state salesperson who "generated a stream of local commerce, from which he earned his livelihood, originating in New York based on sales that plaintiff's invoices labeled as New York transactions."); *LeCroy Corp. v. Hallberg*, No. 09CIV8767, 2010 WL 3958761, at *3 (S.D.N.Y. Oct. 4, 2010) ("Hallberg made his living by working for a New York-based company. During his employment, Hallberg interacted with New York-based LeCroy employees.").

Pl.'s Resp. at 13.

The problem with plaintiff's framing is that it overlooks the nuances of these cases' treatment of the "transacting business" prong and how those nuances might support a different result given the circumstances here.

That is not to say, however, that each cited case rigorously analyzed the "transacting commerce" prong. For instance, in its single-paragraph slip opinion in *Olympus America Inc. v. Fujinon, Inc.*, the First Department provided few details about the underlying facts of that matter. *See Olympus Am., Inc. v. Fujinon, Inc.*, 8 A.D.3d 76, 77 (1st Dep't 2004) ("It was during the course of

his 17-year employment with the New York-based plaintiff that [defendant] acquired the allegedly confidential proprietary information that is the subject of this lawsuit.").

In considering whether the defendant had "transacted business" in New York under Section 302(a)(1), the *Olympus* panel noted that the defendant had "generat[ed] sales between the [plaintiff's] New York headquarters and the customers in [defendant's sales] territories through the phone calls and e-mails [that the defendant] regularly made or sent to New York." *Olympus America, Inc.*, 8 A.D.3d at 77.

"By virtue of these communications," the *Olympus* panel reasoned, the defendant had "generated a stream of local commerce . . . originating in New York" based on sales that *the plaintiff* had labeled on its invoices as "New York transactions." *Olympus America, Inc.*, 8 A.D.3d at 77. Therefore, the panel concluded that the defendant "was more than a passive participant, playing a crucial role in creating the substance of these transactions, and thus transacting business in New York." *Id.*

Reduced to its essence, the *Olympus* panel's reasoning appears to be that, because the plaintiff was a New York-headquartered business, the defendant was the plaintiff's employee, and the defendant "generat[ed] sales" through "phone calls and e-mails he regularly made" to New York, the defendant transacted business in New York under Section 302(a)(1). Terse as the *Olympus* panel opinion may be, its expansive interpretation of "transacts business" in the employment context appears to be supported by some of the other cases SGS cites.

In *Opticare Acquisition Corporation v. Castillo*, a New York corporation headquartered in Westchester County that distributed "optical products" sued former employees who had served as out-of-state branch managers. The company alleged that each of these defendants breached

confidentiality provisions of their employment agreements by leaving to join a competitor. *See Opticare Acquisition Corp. v. Castillo*, 25 A.D.3d 238, 239 (2d Dep't 2005).

The *Opticare* panel noted that "according to the complaint's allegations, as [plaintiff's] out-of-state branch managers," the defendants "had systematic, ongoing relationships with a New York company, with which they were in daily contact." *Opticare Acquisition Corp.*, 25 A.D.3d at 245. The defendants "may have sold [plaintiff's] products in territories outside of New York, but when they did so, they affected local commerce [in New York]." *Id.* "Among other things, they changed [plaintiff's] economic position, bringing the company into contractual relations with customers, obligating it to ship products from New York, and creating accounts payable and receivable." *Id.*

"Even assuming none of the [defendants] ever entered New York to conduct business on [plaintiff's] behalf, it defies logic and common sense to conclude that they did not transact business here, especially when the 21st-Century technology undoubtedly available to them to go about their work, such as access via computer to data [plaintiff] maintained in New York, conferred upon them the benefit of employment with a New York company, while allowing them the option of living and physically working elsewhere." *Opticare Acquisition Corp.*, 25 A.D.3d at 245.

In *LeCroy v. Hallberg*, plaintiff LeCroy, a company headquartered in New York and incorporated in Delaware, provided "protocol analyzers" designed to test electronic devices. It sued Matthew Hallberg, a former employee who lived and worked for LeCroy in California. *LeCroy v. Hallberg*, 2010 WL 3958761, at *1 (S.D.N.Y. Oct. 4, 2010). During the time Hallberg worked for LeCroy, he never worked in LeCroy's New York office. *Id.* at *2. As part of his employment, Hallberg signed a "Confidentiality and Developments and Non-Solicitation Agreement." *Id.* at *1. The agreement explicitly stated that it was not an employment or consulting contract. *Id.*

LeCroy alleged that, while still employed by the company, Hallberg helped decide how to compete with a particular competitor, SerialTek. *LeCroy Corp.*, 2010 WL 3958761, at *1. Hallberg also directed the design and development of new protocol analyzer products aimed at competing directly with SerialTek. *Id.* According to LeCroy's CEO, Tom Reslewic, Hallberg and Reslewic developed strategies to compete with SerialTek, and in so doing, LeCroy gave Hallberg confidential information about its analyzers. *Id.* at *2.

Around the same time, and unbeknownst to LeCroy, Hallberg was actively seeking employment with SerialTek. *LeCroy Corp.*, 2010 WL 3958761, at *2. Shortly thereafter, Hallberg accepted an employment offer from SerialTek but did not resign from LeCroy for another two weeks. *Id.* Upon joining SerialTek, Hallberg participated in one to two dozen sales meetings, a dozen of which were with LeCroy customers. *Id.* Additionally, after Hallberg began working for SerialTek, "he sent a third-party 'reseller' SerialTek's 'banking information' to assist it in purchasing SerialTek products for a large customer." *Id.*

LeCroy subsequently filed suit in the Southern District of New York, asserting claims for breach of contract, misappropriation of trade secrets, unfair competition, and tortious interference. *LeCroy Corp.*, 2010 WL 3958761, at *1. Hallberg moved to dismiss LeCroy's complaint for lack of personal jurisdiction or, in the alternative, to transfer venue. *Id.*

In finding that Hallberg was subject to New York's long-arm jurisdiction under Section 302(a)(1), the district court concluded that he had transacted business in New York. *LeCroy Corp.*, 2010 WL 3958761, at *3. The district court in *LeCroy* noted:

> Hallberg made his living by working for a New York-based company. During his employment, Hallberg interacted with New York-based LeCroy employees. For example, he exchanged emails with over 80 different employees in LeCroy's New York headquarters. He also "worked with LeCroy marketing people at LeCroy headquarters in New York to produce online promotional material...." Hallberg regularly interacted with LeCroy's CEO Tom Reslewic. According to Reslewic,

> Hallberg "would typically send documents and other communications to [Reslewic] via e-mail," and Reslewic "would typically review these documents ... from [LeCroy's] main office in New York." Reslewic also conducted conference calls and video conferences with Hallberg from New York, and give Hallberg "follow-up directives from New York."

*Id.* (internal citations omitted).

The *LeCroy* court interpreted these facts as "similar" to those in *Mercator Risk Services Inc. v. Girden*, 2008 WL 5429886 (S.D.N.Y. Dec. 30, 2008). It emphasized that, in *Mercator*, the court held that out-of-state employees of a New York-based employer had transacted business in New York. For instance, it opined that the *Mercator* court noted that the defendants "interacted with their employer's New York headquarters, accessed data maintained by their employer in New York, availed themselves of the benefit of being employed by a New York company, and generated profits for a New York Company." *LeCroy Corp.*, 2010 WL 3958761, at *3 (quoting *Mercator Risk Services, Inc.*, 2008 WL 5429886, at *3). Some defendants also had "even engaged in further contacts with New York": they had "negotiat[ed] their employment in the state, travel[ed] to the state on business, supervis[ed] employees in the state, and plac[ed] business in the state." *Id.* (quoting *Mercator Risk Services, Inc.*, 2008 WL 5429886, at *3–4).

The *LeCroy* court also emphasized that Hallberg had "entered into the Confidentiality Agreement with his New York-based employer." *LeCroy Corp.*, 2010 WL 3958761, at *4. It likened that agreement to the employment agreements operative in *Opticare Acquisition Corporation v. Castillo*: "In *Opticare*[,] the court held that individual defendants transacted business in New York by entering into employment agreements with New York employers because the agreements 'gave rise to substantial relationships, both substantively and temporally, with a New York employer.'" *Id.* (quoting *Opticare Acquisition Corp.*, 25 A.D.3d at 244).

The *LeCroy* court further remarked that the *Opticare* panel “explicitly noted” that it reached that conclusion even though it assumed that the defendants had not entered into the contracts within New York. *LeCroy Corp.*, 2010 WL 3958761, at *4 (citing *Opticare Acquisition Corp.*, 25 A.D.3d at 244). The district court acknowledged that “[Hallberg’s] Confidentiality Agreement was not an employment agreement[.]” *Id.*

However, it concluded that the confidentiality agreement, likewise, “gave rise to substantial temporal and substantive relationships between Hallberg and LeCroy.” *LeCroy Corp.*, 2010 WL 3958761, at *4; *see id.* (“[T]he Confidentiality Agreement . . . defined certain aspects of the employment relationship between the parties and required Hallberg to refrain from certain activities, like soliciting LeCroy employees, for one year after leaving LeCroy.”).

On these bases, the district court concluded LeCroy had satisfied its burden of showing that Hallberg transacted business in New York. *LeCroy Corp.*, 2010 WL 3958761, at *4.

The upshot of these cases cited by plaintiff and discussed above, as well as the others in its opposition papers, is that they do provide some persuasive authority. And the Court can see how their reasoning may be applied here. But those cases share a feature that appears to be absent here and may have influenced their analyses. In fact, plaintiff even tacitly acknowledges this missing feature: “New York courts routinely find personal jurisdiction under CPLR § 302(a)(1) over out-of-state employees working from home for a *New York employer*.” Pl.’s Resp. at 11 (emphasis added).

Each cited case (Pl.’s Resp. at 11–14) involved a plaintiff company that was either headquartered or incorporated in New York. *Medicrea USA, Inc. v. K2M Spine, Inc.*, 1:17-CV-8677, Compl., Dkt. No. 1 ¶ 1 (“Plaintiff Medicrea USA, Inc. is a Delaware Corporation with its principal place of business at 50 Greene Street, New York, New York 10013.”); *Peeq Media, LLC v.*

*Buccheri*, 1:16-CV-5292, Not. of Removal, Dkt. No. 1 ¶ 5 ("Plaintiff Peeq Media . . . is a . . . company[] organized and existing under the laws of the State of Delaware, with its headquarters and principle place of business in Long Island City, New York."); *LeCroy Corp. v. Hallberg*, 1:09-CV-8767, Compl., Dkt. No. 1 ¶ 6 ("[Plaintiff] LeCroy is a Delaware corporation that maintains its principal place of business at 700 Chestnut Ridge Road, Chestnut Ridge, New York 10977-6499."); *Transaero, Inc. v. Chappell*, 2:13-CV-5752, Not. of Removal, Exh. A, State Court Compl., Dkt. No. 1 at 10 ¶ 1 ("[Plaintiff] Transaero is a corporation organized under the laws of the State of New York, maintaining its principal place of business at 35 Melville Park Road, Melville, New York 11747."); *SmartPros, Ltd. v. Straub*, 24 A.D.3d 653, 653 (2d Dep't 2005). ("The plaintiff is a corporation, based in New York[.]" ); *Opticare Acquisition Corp.*, 25 A.D.3d at 239 ("[P]laintiff, Opticare Acquisition Corp. . . . is a New York corporation whose principal offices are located in Westchester County."); *Olympus America, Inc.*, 8 A.D.3d at 77 ("[D]uring . . . his . . . employment with the New York-based plaintiff[,] [the employee-defendant] acquired the allegedly confidential proprietary information that is the subject of this lawsuit. During that period, [the employee-defendant] . . . generat[ed] sales between the [plaintiff's] New York headquarters and the customers in his territories[.]").

Reviewing these cases, and the cases they cite in turn, it is hard not to see that this fact—that the plaintiffs were either incorporated or headquartered in New York—played an appreciable role in those courts' conclusions that the defendant-employees or -contractors had transacted business in New York under Section 302(a)(1). *See, e.g.*, *LeCroy Corp.*, 2010 WL 3958761, at *3 ("[Defendant] Hallberg made his living by working for a New York-based company. [H]e exchanged emails with over 80 different employees in LeCroy's New York headquarters. He also worked with LeCroy marketing people at LeCroy headquarters in New York to produce online

promotional material[.] Hallberg would typically send documents and other communications to Reslewic via e-mail, and Reslewic would typically review these documents from LeCroy's main office in New York.") (cleaned up); *Opticare Acquisition Corp.*, 25 A.D.3d at 245 ("Even assuming none of the appellants ever entered New York to conduct business on [plaintiff's] behalf, it defies logic and common sense to conclude that they did not transact business here, especially when the 21st-Century technology undoubtedly available to them to go about their work, such as access via computer to data [plaintiff] maintained in New York, conferred upon them the benefit of employment with a New York company, while allowing them the option of living and physically working elsewhere."); *Medicrea USA, Inc.*, 2018 WL 3407702, at *5 ("Brown and Haigh worked as sales representatives for a New York-based company, Medicrea—Brown for nearly three years, and Haigh for one[.] Thus, their employment relationship constitutes an ongoing contractual relationship with a New York entity. Flowing from that ongoing employment relationship are a litany of contacts with the state of New York[.]").

There is some analytical force to the argument that a remote employee working for a New York-incorporated or New York-headquartered employer has transacted business in New York by virtue of that employment relationship. But, here, the connection between the parties and New York is more attenuated. Plaintiff is a Delaware corporation with its principal place of business and headquarters in Bloomfield, New Jersey. Compl. ¶ 8. By comparison, the argument has far less force when asserted by a multinational corporation that simply has a New York outpost. That is particularly so where the remote employee's connections to New York, at least as alleged here, are paltry. Plaintiff attempts to portray Quinn's connection to New York, by sole virtue of his employment with plaintiff, as substantial and numerous. But few of its factual assertions contain enough detail to establish either.

Plaintiff alleges that Quinn was "in regular contact" with its New York office, but that general assertion tells the Court little. Compl. ¶ 16. The same holds true of plaintiff's bare assertions that Quinn "submitted all his orders to SGS's office in New York" or traveled "occasionally" to that office. *Id.* Plaintiff likewise asserts that "[w]hen Quinn accessed SGS's computer system . . . he connected to its servers located in New York." *Id.* Yet here, too, plaintiff leaves the Court to suppose that this fact is not merely incidental or tertiary to the parties' employment relationship.

Beyond these nebulous assertions, plaintiff asserts that Quinn reported to Lisa Swab, who was "based in East Syracuse, New York"; that he signed an "offer letter" after receiving permission to work part-time with an SGS partner, Terra Base; and that the letter, which formally "reduced the hours he was required to work[,]" stated that his position was "based in East Syracuse, NY." *See* Compl. ¶ 25; Swab Decl., Exh. A, Offer Letter, Dkt. No. 21-4 at 4.

Nevertheless, although the Court suspects that the cited cases relied heavily on the plaintiffs' New York incorporation or headquarters in concluding that the employee-defendants transacted business in the state, it has found no authority making either fact a prerequisite to jurisdiction. Nor does Section 302(a)(1) explicitly impose such a requirement; the statute simply asks whether a non-domiciliary defendant "transacts any business within the state." Therefore, the Court concludes that plaintiff has made a prima facie showing, albeit one teetering on the edge, that Quinn transacted business in New York by virtue of his employment relationship with plaintiff.

(2) *Claims "Arising From" a Transaction of Business*

"Under the second prong, the plaintiff must show that its causes of action 'arise from' the defendants' transactions in New York." *Lively v. Wayfarer Studios LLC*, 810 F. Supp. 3d 421, 443 (S.D.N.Y. 2025) (internal citations omitted). "A suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the

claim asserted and the actions that occurred in New York." *Id.* (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007)). "'[C]ausation is not required,' but there must be 'at a minimum, a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former.'" *SUEZ Water New York Inc. v. E.I. du Pont de Nemours & Co.*, 578 F. Supp. 3d 511, 528–29 (S.D.N.Y. 2022) (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339 (N.Y. 2012)).

"[W]hether a plaintiff's claim arises from a defendant's New York contacts depends upon 'the nature and elements of the particular causes of action pleaded.'" *Edwardo v. Roman Cath. Bishop of Providence*, 579 F. Supp. 3d 456, 475 (S.D.N.Y. 2022) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169 (2d Cir. 2013)). "Where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute.'" *Edwardo*, 579 F. Supp. 3d at 475 (quoting *Licci ex rel. Licci*, 732 F.3d at 169). However, "[a] connection that is 'merely coincidental' is insufficient to support jurisdiction." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (citing *Johnson v. Ward*, 4 N.Y.3d 516, 520 (N.Y. 2005)). "This inquiry is a fact-specific one, and when the connection between the parties' activities in New York and the claim crosses the line from 'substantially related' to 'mere coincidence' is not always self-evident." *Id.*

In this case, plaintiff has also made a prima facie showing that the causes of action alleged against Quinn in its complaint arises from Quinn's transaction of business in New York, as each claim against him arises from the employment relationship he had with plaintiff. The breach of contract claim rests on his alleged violation of plaintiff's Restrictive Covenant and Confidentiality Agreement. *See* Compl. ¶¶ 71–78. The breach of duty of loyalty claim rests on his alleged

disloyalty while serving as plaintiff's employee. *See id.* ¶¶ 79–87. And the DTSA claim rests on allegations that he used his access, as plaintiff's employee, to plaintiff's information and systems to misappropriate plaintiff's trade secrets. *See id.* ¶¶ 60–70.

In sum, plaintiff has made a prima facie showing that Quinn transacted business in New York and that the claims against him arise from that business activity.

**(b) Due Process**

Lastly, exercising specific jurisdiction over Quinn comports with constitutional due process principles. "Section 302(a) permits the exercise of personal jurisdiction in a narrower range of circumstances than the Due Process Clause." *Just Play, LLC v. A Romantic Jewellery Store*, 2025 WL 2933775, at *9 (S.D.N.Y. Feb. 10, 2025); *see D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006) ("[T]he constitutional requirements of personal jurisdiction are satisfied because application of N.Y. C.P.L.R. § 302(a) meets due process requirements.") (citing *United States v. Montreal Tr. Co.*, 358 F.2d 239, 242 (2d Cir. 1966)).

Plaintiff has made a prima facie showing of specific jurisdiction over Quinn. Accordingly, defendants' motion under 12(b)(2) to dismiss for lack of personal jurisdiction over Quinn is denied.

**(ii) The Arm Group**

To the extent plaintiff's argument that Quinn transacted business in New York is a reach, its argument that the Arm Group did so is a leap and a bound too far. In its complaint, plaintiff invokes only one subsection of New York's long-arm statute as to the Arm Group: Section 302(a)(1). Yet, now, plaintiff does not merely collapse the two-pronged jurisdictional analysis required under Section 302(a)(1) as it did with Quinn; it sidesteps the analysis entirely. Instead, plaintiff offers only variations of the following: "the Court can properly assert jurisdiction over

the Arm Group because Mr. Quinn acted as its sole agent in New York." Pl.'s Resp. at 16; *see also id.* at 17.

Certainly, Section 302(a) permits personal jurisdiction over a non-domiciliary based on the acts of its agent. But those acts must fall within one of the subsections enumerated in Section 302(a). Plaintiff's complaint asserts that jurisdiction over the Arm Group is appropriate specifically under Section 302(a)(1). *See* Compl. ¶ 15. Meaning that the Arm Group must "transact[] any business within the state[.]" N.Y. C.P.L.R. 302(a)(1).

Plaintiff does not offer explicit argument regarding this prong. What it does offer is thin:

> Mr. Quinn . . . sent multiple emails from his SGS work email account to his Arm Group email account. Those emails contained or attached SGS's trade secrets and other confidential information. Mr. Quinn thereby acted for the Arm Group's benefit, with its knowledge and subject to its control, when he misappropriated SGS's trade secret and confidential information to aid its business. [J]urisdiction over the Arm Group is therefore proper because Mr. Quinn, the sole officer and director of the Arm Group , acted as the company's agent in New York.

Pl.'s Resp. at 17 (internal citations omitted).

True, Section 302(a) is "a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (internal citations omitted). And "[a]lthough Section 302(a)(1) is typically invoked in breach of contract cases, it applies as well to actions in tort when supported by a sufficient showing of facts to establish that the tort arose out of the relevant transaction." *N. Fork Partners Inv. Holdings, LLC v. Bracken*, 2020 WL 6899486, at *10 (S.D.N.Y. Nov. 23, 2020) (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 27 (2d Cir. 2004) (internal alterations omitted)).

For instance, "[a]pplying this standard, district courts in [the Second] [C]ircuit have concluded that the 'single act' of selling counterfeit goods into New York satisfies the long-arm statute under section 302(a)(1)." *Chloe*, 616 F.3d at 170. But the "single act" plaintiff offers to demonstrate that the Arm Group transacted business in New York is Quinn's sending emails from his SGS email account to his Arm Group email account, the contents of which are unclear; plaintiff says only that they contained "trade secrets and other confidential information" and thus were the vehicle for the alleged misappropriation.

Plaintiff contends that Quinn's emails to himself were not innocuous; rather, plaintiff argues that Quinn's emails effectuated the Arm Group's misappropriation of SGS's trade secrets, its tortious interference with SGS's contract with Quinn, and its aiding and abetting of Quinn's breach of his duty of loyalty to SGS. In other words, plaintiff believes that Quinn's sending of the messages was itself tortious conduct. Yet, stripped of legal assertions and conclusions, plaintiff's theory appears to be that, as Quinn was the Arm Group's agent, his emails to himself qualify as a business transaction by the Arm Group under New York's long-arm statute. The Court cannot agree. The sheer act of emailing oneself, standing alone, does not constitute a business transaction within the meaning of Section 302(a)(1).

Plaintiff's cited cases—again offered largely as contextless quotations or reductive parentheticals—do not persuade the Court otherwise. Some do little more than restate general principles of law. *See, e.g.*, Pl.'s Resp. at 16 ("§ 302(a) authorizes personal jurisdiction as to causes of action arising out of the enumerated acts whether performed 'in person or through an agent.'") (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 360 (S.D.N.Y. 2004)). Some involve cases with additional facts—facts not alleged here— demonstrating that the party subjected to jurisdiction under Section 302(a)(1), in fact, transacted business in

New York. *See, e.g.*, *Front, Inc. v. Khalil*, 103 A.D.3d 481 (1st Dep't 2013) ("The complaint alleges that [defendant] Khalil, an employee of plaintiff, and employees of EOC, [plaintiff's competitor and Khalil's co-defendant], worked together to use plaintiff's confidential and proprietary information to divert work for Apple Inc., including a project for the Apple Store on Broadway in Manhattan, from plaintiff to Khalil and EOC. These allegations are sufficient to establish that [EOC] transacted business in New York, through Khalil as their agent, and therefore to invoke jurisdiction over them pursuant to CPLR 302(a)(1)."); Pl.'s Resp. at 16–17 (citing *Front, Inc.*, 103 A.D.3d at 482). One cited case does not even involve the relevant part of the long-arm statute. *See Cont'l Indus. Grp., Inc. v. Altunkilic*, 2016 WL 11796844, at *2 (S.D.N.Y. Apr. 6, 2016) ("Because Plaintiff makes a prima facie case that jurisdiction is proper under § 302(a)(3)(ii), the Court need not address the statute's other provisions."); Pl.'s Resp. at 16–17 (citing *Continental Industries Group, Inc.*, 2016 WL 11796844, at *2).

Consequently, plaintiff has not made a prima facie showing that jurisdiction over defendant Arm Group is proper pursuant to Section 302(a)(1).[2] Having found no statutory basis for personal jurisdiction over the Arm Group pursuant to New York's long-arm statute, the Court "need not decide whether exercising such jurisdiction would comport with constitutional due process." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. UPS Supply Chain Sols., Inc.*, 74 F.4th 66, 73 (2d Cir. 2023) (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)). Moreover, given that there is no personal jurisdiction over the Arm Group, the Court declines to rule on the merits of plaintiffs' claims against the Arm Group. *See, e.g.*, *Century Sports, Inc. v. Ross Bicycles, LLC*,

---

[2] Because plaintiff does not assert that jurisdiction is proper pursuant to the other provisions of Section 302, the Court does not consider them. *See, e.g.*, *Pitcher v. Union Carbide Corp.*, 2023 WL 5277589, at *2 n.1 (S.D.N.Y. Aug. 16, 2023); *Virgin Enters. Ltd. v. Virgin Eyes LAC*, 2009 WL 3241529, at *5 n.5 (S.D.N.Y. Sept. 30, 2009).

2021 WL 1108639, at *6 (E.D.N.Y. Mar. 23, 2021). Accordingly, the Arm Group will be dismissed.

**B. Defendants' Rule 12(b)(3) Motion**

**1. Applicable Law**

"The legal standard for a motion to dismiss for improper venue is the same as a motion to dismiss for lack of personal jurisdiction." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Wynn Las Vegas, LLC*, 509 F. Supp. 3d 38, 49 (S.D.N.Y. 2020) (quoting *Casville Invs., Ltd. v. Kates*, 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013). "When a defendant challenges the venue of the court, the plaintiff has the burden to establish that venue is proper." *JB Aviation v. R Aviation Charter Servs., LLC*, 143 F. Supp. 3d 37, 47 (E.D.N.Y. 2015). "If the court has not held an evidentiary hearing, 'the plaintiff need only make a *prima facie* showing of venue.'" *Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*, 694 F. Supp. 3d 374, 383 (S.D.N.Y. 2023) (quoting *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005)).

A motion to dismiss under Rule 12(b)(3) "'allows dismissal only when venue is wrong or improper,' which 'depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws.'" *TileBar v. Glazzio Tiles*, 723 F. Supp. 3d 164, 182 (E.D.N.Y. 2024) (quoting *National Union Fire Insurance Company of Pittsburgh, Pa.*, 509 F. Supp. 3d at 49). "In the absence of a more specific statute regarding venue, whether venue is 'wrong' or 'improper' for a federal civil action is governed by 28 U.S.C. § 1391." *Eddi v. Antebi*, 2026 WL 880263, at *15 (S.D.N.Y. Mar. 31, 2026) (citing *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 55 (2013)).

Under Section 1391, "[v]enue is proper in the chosen forum if: (1) at least one defendant resides in the district and all the defendants reside in the same state in which the district is located,

(2) a 'substantial part' of the events giving rise to the claim occurred in the district, or (3) the defendant is subject to personal jurisdiction in the district and 'there is no district in which an action may otherwise be brought.'" *Reed Int'l, Inc. v. Afghanistan Int'l Bank*, 657 F. Supp. 3d 287, 297–98 (S.D.N.Y. 2023) (citing 28 U.S.C. § 1391(b)).

"When venue is challenged, the court must determine whether the case falls within one of the three categories set out in § 1391(b)." *Kaiser v. USAA Life Ins. Co.*, 818 F. Supp. 3d 607, 615 (S.D.N.Y. 2026) (quoting *Atlantic Marine Const. Co.*, 571 U.S. at 56). "If it does, venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred under § 1406(a)." *Atlantic Marine Const. Co.*, 571 U.S. at 56. "As a result, a case filed in a district that falls within § 1391 may not be dismissed under § 1406(a) or Rule 12(b)(3)." *Atlantic Marine Const. Co.*, 571 U.S. at 56.

**2. Analysis**

Plaintiff asserts that venue is proper under Section 1391(b) because "a substantial part of the events giving rise to the claims occurred in East Syracuse, New York." Compl. ¶ 18. "Venue is proper here because Mr. Quinn stole SGS's trade secrets from its servers in East Syracuse." Pl.'s Resp. at 19. That alone, plaintiff contends, "is sufficient for venue." *Id.*

For their part, defendants argue, "Here, a substantial part of the events or the alleged conduct occurred in California[:] Quinn performed all daily job duties from his home office in California; any alleged misuse of confidential information, disloyal acts, or interference with contracts occurred while Quinn was physically located in California; and ARM—the alleged co-tortfeasor—is incorporated and headquartered in California, and any allegedly wrongful coordination occurred there." Defs.' Mot. at 15.

"The Second Circuit has 'caution[ed] district courts to take seriously the adjective "substantial"' and to 'construe the venue statute strictly.'" *Matchroom Boxing Ltd. v. Paul*, 2024 WL 4363700, at *4 (S.D.N.Y. Sept. 30, 2024) (quoting *Gulf Ins. Co.*, 417 F.3d at 357); *see also Blakely v. Lew*, 607 F. App'x 15, 17 (2d Cir. 2015) (summary order). "That means for venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question." *Ventricelli v. Nicklin*, 2020 WL 132334, at *10 (N.D.N.Y. Jan. 13, 2020) (quoting *Blakely*, 607 F. App'x at 17).

However, Section 1391(b)(2) "does not restrict venue to the district in which the 'most substantial' events or omissions giving rise to a claim occurred[.]" *Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 547 (S.D.N.Y. 2024) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005)). Neither does it require courts "to determine the 'best venue,' but merely a logical one with a substantial connection to the litigation." *Diaz-Roa*, 757 F. Supp. 3d at 547 (quoting *Reliance Ins. Co. v. Polyvision Corp.*, 474 F.3d 54, 59 (2d Cir. 2007)).

"Venue can be proper in more than one district 'as long as "a substantial part" of the underlying events took place in those districts.'" *Budinski v. Massachusetts*, 758 F. Supp. 3d 158, 161 (W.D.N.Y. 2024) (quoting *Gulf Ins. Co.*, 417 F.3d at 356). "'Substantiality' for venue purposes is more a qualitative than quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." *Ventricelli*, 2020 WL 132334, at *10 (quoting *Blauschild v. Tudor*, 31 F. Supp. 3d 527, 531 (E.D.N.Y. 2014)).

Courts that have considered similar fact patterns and claims, and whether a computer server's location in the district alone satisfies § 1391(b)(2), are of two minds on the issue.

For instance, in *Slocumb Law Firm v. Trollinger*, the plaintiff, an Alabama law firm, maintained satellite offices in Baltimore, Maryland, and Washington, D.C. *Slocumb L. Firm, LLC v. Trollinger*, 2015 WL 4715067, at *1 (M.D. Ala. Aug. 7, 2015). The defendant, Matthew Trollinger, was an attorney formerly employed by the firm in its mid-Atlantic offices. *Id.* During that time, Trollinger never visited, worked in, or represented clients in Alabama. *Id.* However, Trollinger did communicate daily with Mike Slocumb, the plaintiff's founder and sole member, by phone and computer. *Id.*

The firm maintained its clients' personal and case-related information in an electronic database on a server located in Auburn, Alabama. *Slocumb Law Firm, LLC*, 2015 WL 4715067, at *2. It alleged that the data stored on the server, specifically the terms of its client retention agreements, constituted a trade secret, and that Trollinger impermissibly retained information from the database following his departure from the firm. *Id.* The firm also alleged that Trollinger had "neglected his fiduciary duties to it during his employment by failing to pay liens against Slocumb's clients out of settlement proceeds collected for clients." *Id.*

On those bases, the firm filed suit in the Middle District of Alabama, asserting claims for breach of fiduciary duty, negligence, and violation of the Alabama Trade Secrets Act. *Slocumb Law Firm, LLC*, 2015 WL 4715067, at *6. Trollinger moved to dismiss pursuant to 12(b)(3), among other bases. *Id.* at *1. He argued that "all events that gave rise to each of [the law firm's] claims (i.e., [his] alleged failure to satisfy [the law firm's] clients' liens . . . and [his] alleged misappropriation of information from the [computer] server) must have occurred outside of Alabama in either Maryland or Washington, D.C." *Id.* at *6.

The law firm maintained that its chosen venue, the Middle District of Alabama, was proper. *Slocumb Law Firm, LLC*, 2015 WL 4715067, at *6. First, it argued that the defendant, Trollinger,

"should have reported the clients' liens to [the law firm's] Alabama office." *Id.* Trollinger contended that the point was irrelevant to determining venue—"regardless of whether he should have reported the liens to his employer in Alabama, his alleged failure to pay the liens on behalf of [the plaintiff]'s clients occurred in Maryland or Washington, D.C., where he practiced law and represented the clients." *Id.* Second, with respect to Trollinger's alleged misappropriation of its trade secrets, the law firm asserted that venue was proper in Alabama, where its computer server was maintained. *Id.* In doing so, the law firm relied "on an unpublished opinion from the Northern District of Georgia for its conclusion that 'the situs of [a] tort [occurring over an internet website] is considered to be where the website, or servers which maintain the website, are located.'" *Id.* (quoting *Paradise Media Ventures, LLC v. Mills,* 2013 WL 6388627, at *3 (N.D. Ga. Dec. 5, 2013) (in turn, quoting *Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 241 (S.D.N.Y. 2010)).

After considering the parties' arguments, the *Slocumb* court deemed that "none of the 'events or omissions giving rise to' each of [the law firm's] three claims—much less a 'substantial part' of those events or omissions—'occurred' in Alabama." *Slocumb Law Firm, LLC*, 2015 WL 4715067, at *7 (citing 28 U.S.C. § 1391(b)(2)). The court concluded that the former employee's alleged acts of negligence and breach of fiduciary duty were "omissions" that occurred outside the Middle District of Alabama because "Trollinger practiced law outside th[e] district." *Id.* Moreover, Trollinger's alleged misappropriation of the law firm's trade secrets was "an 'event' which occurred, on Mr. Trollinger's part, outside th[e] district when he accessed the [plaintiff's] server." *Id.* Accordingly, the court in *Slocumb* held that venue was improperly laid in the Middle District of Alabama. *Id.*

In *Hypower Inc. v. Atlantic Electric, LLC*, the plaintiff, Hypower, contracted with DWG & Associates to perform electrical work at the Charleston Air Force Base in Charleston, South Carolina. 2013 WL 12086268, at *1 (S.D. Fla. Feb. 13, 2013). Hypower attended pre-construction meetings at the base in South Carolina and had begun preliminary work on the contract. *Id.* In the course of this undertaking, Hypower reached out to the defendant, Atlantic Electric, a South Carolina company, regarding the possibility of sub-contracting a portion of the work to be performed in Charleston. *Id.* "In furtherance of this potential sub-contract, Hypower gave Atlantic access to information about the project that was contained on Hypower's computer servers in Florida." *Id.*

Filing suit, Hypower alleged that instead of submitting a bid for a sub-contract, the defendant, Atlantic, contacted DWG to induce DWG to cancel its contract with Hypower and instead award it to Atlantic. *Hypower, Inc.*, 2013 WL 12086268, at *1. On this basis, Hypower brought two claims against Atlantic: tortious interference with a contractual relationship and tortious interference with a business relationship. *Id.* Hypower alleged that venue existed in the Southern District of Florida, where it had filed suit, "because a substantial part of the events giving rise to [its] claims occurred in [the] District, including the place of the tortious acts committed by [the defendant]." *Id.* at *3. Hypower asserted that Atlantic had "'improperly and with malice' accessed Hypower's servers in Fort Lauderdale, Florida, to gain information relating to the South Carolina project for the purpose of interfering with Hypower's contract with DWG." *Id.* at *2.

Atlantic moved for a transfer of venue to the District of South Carolina. *Hypower, Inc.*, 2013 WL 12086268, at *1. Ultimately, "the anchor for venue in the Southern District of Florida," the district court noted, was "Atlantic's cyber-based actions of accessing information, via the intranet, from Hypower's servers in Florida." *Id.* at *3. The court deemed this anchor untethered:

"Atlantic's act of obtaining information from Hypower's server in Florida, while probably relevant, is not essential to the tortious-interference claims[;] [t]his preliminary act is not [the] type of activity that is normally adequate to constitute a *substantial* part of the events giving rise to the claim." *Id.*

Notwithstanding the merit of their reasoning, *Slocumb Law Firm* and *Hypower, Inc.* reflect a minority position. The prevailing view appears to be that—under similar facts—a computer server's location satisfies Section 1391(b)(2). *See, e.g.*, *irth Sols., LLC v. Apex Data Sols. & Servs., LLC*, 2019 WL 283831, at *4 (W.D.N.Y. Jan. 22, 2019) ("Defendants argue that Plaintiff has not alleged that any significant events occurred in New York but merely relies on the presence of Plaintiff's servers in Rochester to establish venue here[.] But acquiring trade secrets by accessing a server in New York can be a significant event for venue purposes[.] This Court similarly finds that venue is appropriate here.") (citing *Argent Funds Grp., LLC v. Schutt*, 2006 WL 2349464, at *2 (D. Conn. June 27, 2006)); *EMI Corp. v. Opal*, 2015 WL 5782069, at *2 (N.D. Ohio Sept. 29, 2015) ("Plaintiff asserts that venue here is appropriate under § 1391(b)(2). This Court agrees. The Complaint alleges that defendant accessed [plaintiff]'s computer systems and files for the purpose of acquiring [plaintiff's] trade secrets, confidential, and proprietary information. [Plaintiff's] email systems and servers are located in Cuyahoga County, Ohio. Courts have found that where a defendant accesses trade secret information out of state stored on a computer located in the forum state, venue is proper where the computer servers are located.") (citing generally *Premier Grp., Inc v. Bolingbroke*, 2015 WL 4512313 (D. Colo. July 27, 2015)); *Archer Healthcare, Inc. v. Cuthbert-Dutche*, 2018 WL 1787734, at *1–2 (E.D.N.C. Apr. 13, 2018) ("The complaint alleges that the fraudulent and improper access to its materials occurred when [defendant] Cuthbert-Dutcher used [plaintiff's employee's] laptop; Cuthbert-Dutcher is a resident of Colorado . . . and there is

no allegation that any offending access occurred from anywhere outside Colorado. However, plaintiff argues in response to the motion to dismiss that a substantial part of the property that is the subject of the action, namely its database, is maintained in Wilmington, North Carolina, thus giving rise to venue in this district under § 1391(b)(2). As other courts have held that the location of a server or database is sufficient to constitute the situs of the injury or the property subject to the action, *see, e.g., Verizon Online Servs., Inc. v. Ralsky*, 203 F. Supp. 2d 601, 623 (E.D. Va. 2002), the Court concludes that venue is proper in this district."); *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 237 (D. Mass. 2011) ("In this case, venue is proper in this district. Although Schafer's misappropriation of Optos' trade secrets arguably occurred in California, outside this judicial district, that misappropriation was merely the "triggering event" prompting Optos' complaint; the entire sequence of events includes Schafer accessing those alleged trade secrets from computer servers in Massachusetts and acquiring additional confidential information on a thumb drive sent to him from Massachusetts."); *Abira Med. Lab'ys, LLC v. Karim*, 2022 WL 44051, at *10 (E.D. Pa. Jan. 5, 2022) ("Karim also knew that the information she sought to receive in violation of the employment agreements (i.e., the customer lists) was located on the employer's computer servers in Pennsylvania. These events constitute a 'substantial part' of [the] tortious interference claims against Karim.").

The Court is disinclined to depart from the weight of authority on this matter. It concludes that venue is proper in this district. Therefore, defendants' motion to dismiss for improper venue is denied.

### C. Defendants' Motion to Transfer under 28 U.S.C. § 1404(a)[3]

### 1. Applicable Law

Alternatively, defendants request a transfer of venue to the Central District of California. *See* Defs.' Notice of Mot., Dkt. No. 12 at 2 ("Defendants seek, as alternative relief to dismissal, that the action be transferred to the Central District of California for the reasons laid out in the Memorandum of Law.").

Where "venue is proper but may be more appropriate in a different district, the Court *may*, pursuant to the doctrine of *forum non conveniens* codified in 28 U.S.C. § 1404(a), transfer the action to a different judicial district." *Chen v. Wang*, 793 F. Supp. 3d 447, 452 (E.D.N.Y. 2025). "[Section] 1404(a) does not condition transfer on the initial forum's being 'wrong.'" *Id.* (quoting *Atlantic Marine Const. Co.*, 571 U.S. at 59).

"When deciding a motion to transfer pursuant to Section 1404(a), courts undertake a two-step inquiry." *Dow Jones & Co., Inc. v. Perplexity AI, Inc.*, 797 F. Supp. 3d at 334 (citing *Enigma Software Grp. USA, LLC v. Malwarebytes Inc.*, 260 F. Supp. 3d 401, 407 (S.D.N.Y. 2017)).

---

[3] Defendants also request that the Court dismiss this case pursuant to the "First-Filed Rule." *See* Defs.' Mot, Dkt. No. 12-1 at 16–18. However, the alleged "first-filed action" here is pending "in California State Court, specifically, Riverside County Superior Court." Defs.' Mot. at 17; *see* Defs.' Ex. A, Quinn's Compl., Dkt. No. 12-2 at 4–18. "The first filed rule, a change of venue principle, permits the transfer or dismissal of subsequently commenced litigation involving the same parties and the same issues when both suits are pending in federal courts." *Kytel Int'l Grp., Inc. v. Rent A Ctr., Inc.*, 43 F. App'x 420, 422 (2d Cir. 2002) (summary order). As a doctrine of federal comity, "the first filed rule applies *only* when both suits are pending in federal courts." *Kytel Int'l Grp., Inc. v. Rent-A-Ctr., Inc.*, 2002 WL 31300343, at *1 (S.D.N.Y. Sept. 6, 2002) (emphasis added) (citing generally *Kytel Intern. Group, Inc.*, 43 F. App'x 420)); *see also Tinnin v. Sutter Valley Med. Found.*, 647 F. Supp. 3d 864, 871 (E.D. Cal. 2022) ("[T]he overwhelming majority of cases have concluded that the federal first-to-file rule does not apply where the first-filed case is pending in state court.") (collecting cases); *Johnson v. Textron Aviation, Inc.*, 2023 WL 7696870, at *4 (D. Kan. Nov. 15, 2023) (same); *Healthcare Cap., LLC v. Healthmed, Inc.*, 213 F. Supp. 2d 850, 856 (S.D. Ohio 2002) ("Here, the actions similar to the matter *sub judice* were previously filed in *state* court, not federal court. Thus, the first-to-file doctrine is inapplicable in this case."); *Spellman v. Express Dynamics, LLC*, 150 F. Supp. 3d 378, 387 (D.N.J. 2015) ("This Court is not persuaded that the first-filed rule applies where the earlier-filed case is proceeding in state court[.]"); *Schmidt v. Verascomp, Inc.*, 2008 WL 11331749, at *1 n.1 (S.D. Fla. July 30, 2008) ("[I]t is now well settled that the first-filed ruled does not apply when the first-filed action is pending in state court."); *Axis Surplus Ins. Co. v. Port of Port Arthur Navigation Auth. of Jefferson Cnty.*, 2022 WL 4286495, at *4 (E.D. Tex. Sept. 15, 2022) ("Because the Port filed its lawsuit in state court, the first-to-file rule does not apply."). Consequently, the Court denies defendants' request.

First, a court must decide if the suit "might have been brought in the district to which transfer is sought." *Id.* at 335 (quoting *Smart Skins LLC v. Microsoft Corp.*, 2015 WL 1499843, at *4 (S.D.N.Y. Mar. 27, 2015)). "A case might have been brought in another forum if at the time the suit was brought, the defendants were subject to jurisdiction and venue was proper in that district." *Id.* (internal citations and alterations omitted). "Second, the court must determine 'whether the convenience of the parties and witnesses and the interests of justice favor transfer.'" *Id.* (quoting *In re Seroquel XR (Extended Release Quetiapine Fumarate) Litig.*, 2020 WL 5587416, at *3 (S.D.N.Y. Aug. 12, 2020)). In deciding whether to transfer an action, courts in the Second Circuit weigh several non-exclusive factors:

> (1) the plaintiff's choice of forum,
> (2) the convenience of witnesses,
> (3) the location of relevant documents and relative ease of access to sources of proof,
> (4) the convenience of parties,
> (5) the locus of operative facts,
> (6) the availability of process to compel the attendance of unwilling witnesses, and
> (7) the relative means of the parties.

*N-N v. Mayorkas*, 540 F. Supp. 3d 240, 254 (E.D.N.Y. 2021) (citing *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006)).

"There is no rigid formula for balancing these factors and no single one of them is determinative. Instead, weighing the balance 'is essentially an equitable task' left to the Court's discretion." *Guardian Life Ins. Co. of Am. v. Coe*, 724 F. Supp. 3d 206, 213 (S.D.N.Y. 2024) (quoting *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 561 (S.D.N.Y. 2000)). The party seeking transfer "bears the burden of establishing the propriety of transfer by a clear and convincing showing." *Horanzy v. Vemma Nutrition Co.*, 87 F. Supp. 3d 341, 346 (N.D.N.Y. 2015). "[This] burden is often described as a heavy one." *Andrews v. A.C. Roman & Assocs., Inc.*, 914 F. Supp. 2d 230, 237 (N.D.N.Y. 2012).

**2. Analysis**

Defendants assert, and plaintiff does not contest, that this suit could have been brought in the Central District of California. *See* Defs.' Mot. at 14–15 (noting Quinn resides, and the Arm Group's principal place of business is located, in La Quinta, California). As venue is proper in both New York and California, the Court must consider whether, for reasons of convenience and fairness, this suit should be transferred to the Central District of California.

Following consideration of the factors under Section 1404(a) and given the totality of the circumstances, the Court declines to transfer this suit to the Central District of California; such action is neither warranted nor required in the interest of justice.

**(i) SGS's Choice of Forum**

"It is well settled that the plaintiff's choice of forum is 'given great weight.'" *Sarracco v. Ocwen Loan Servicing, LLC*, 220 F. Supp. 3d 346, 356 (E.D.N.Y. 2016) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 107 (2d Cir. 2006)). Thus, "[a] plaintiff's choice of venue is entitled to significant consideration and will not be disturbed unless other factors weigh strongly in favor of transfer." *Sarracco*, 220 F. Supp. 3d at 356 (quoting *Royal Ins. Co. of Am. v. United States*, 998 F. Supp. 351, 353 (S.D.N.Y. 1998)).

Even so, "the degree of deference given to a plaintiff's forum choice varies with the circumstances." *Gaynor v. Diamond*, 2025 WL 2256662, at *14 (S.D.N.Y. Aug. 7, 2025) (internal citations omitted); *see also Farina v. Bank of New York Mellon*, 2026 WL 2351491, at *2 (S.D.N.Y. Aug. 11, 2026) ("A plaintiff's choice of forum is accorded less deference where plaintiff does not reside in the chosen forum and the operative events did not occur there.") (citing *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001)). However, here, defendants have not demonstrated that the other convenience factors outweigh plaintiff's chosen forum.

**(ii) Witnesses**

Defendants assert that "the majority of any witnesses are in California." Defs.' Mot. at 21 (citing Quinn Decl., Dkt. No. 12-3 ¶ 10); *id.* at 8 ("[T]he relevant witnesses . . . are centered entirely there.") (citing Quinn Decl. ¶ 10); *id.* at 9 ("[T]he majority of likely witnesses are also located in California."); *id.* at 10 ("[T]he witnesses . . . are there[.]"); *see also id.* at 9 (asserting "the California-centric nature of the []witnesses").

Yet this assertion lacks any factual backing. Even Quinn's own declaration—the sole support that defendants offer—speaks only of potential, hypothetical unnamed "witnesses." *See* Quinn Decl. ¶ 10 ("[A]ny witnesses . . . I plan to use to defend myself against allegations of wrongdoing *would be* in California.") (emphasis added). "Vague generalizations and failure to clearly specify the key witnesses to be called, along with a statement concerning the nature of their testimony, are an insufficient basis upon which to grant a change of venue under § 1404(a)." *M7 Industria E Comercio De Compensados E Laminados Ltda. v. U.S. Structural Plywood Integrity Coal.*, 2026 WL 774792, at *8 (S.D.N.Y. Mar. 18, 2026) (quoting *Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*, 6 F. Supp. 2d 203, 208–09 (S.D.N.Y. 1998)).

For its part, plaintiff offers no information regarding the existence of its own witnesses.[4]

Because the information the parties have provided is insufficient to weigh the convenience of California versus New York with any confidence, this factor is neutral.

[4] In finding that a change of venue under 1404(a) was unwarranted, the district court in *EMI Corp. v. Opal* emphasized that "the witnesses who may testify on plaintiff's behalf involving the systems and servers are located here, and computer forensic consultants who examined and analyzed the electronic equipment . . . are also located in this district." *EMI Corporation*, 2015 WL 5782069, at *3. Here, plaintiff's computer forensic consultant appears to be based in Texas. *See* Landry Decl., Dkt. No. 21-3 at 2. Though one potential witness, Matthew Flanigan, plaintiff's Application Architecture supervisor, appears based in East Syracuse. *See* Flanigan Decl., Dkt. No. 21-1 at 2.

**(iii) Documents and Sources of Proof**

"In an era of electronic documents, easy copying and overnight shipping, this factor assumes much less importance than it did formerly. Furthermore, the location of documents is entitled to little weight unless the movant makes a detailed showing of the burden it would incur absent transfer." *Starr Indem. & Liab. Co. v. Brightstar Corp.*, 324 F. Supp. 3d 421, 441 (S.D.N.Y. 2018) (internal citations and alterations omitted); *see also Travis v. Navient Corp.*, 284 F. Supp. 3d 335, 350 (E.D.N.Y. 2018) ("[T]he Court does not view this factor as particularly significant given the technological age in which we live, with the widespread use of, among other things, electronic document production.") (quoting *EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342, 352 (E.D.N.Y. 2012)).

Defendants fail to address how this factor applies to this case. Accordingly, this factor is neutral. *See, e.g.*, *Guardian Life Ins. Co. of Am. v. Coe*, 724 F. Supp. 3d 206, 215 (S.D.N.Y. 2024).

**(iv) Convenience of the Parties**

Defendants assert that this forum is inconvenient to Quinn yet provide no elaboration on how or why. The only arguments articulated in their motion that can be construed as support for this assertion is that Quinn resides in California and that the present forum is "inaccessible to Quinn's existing California counsel." Defs.' Mot. at 20.

But these arguments, as presented, lack merit. *Cf. Chichelo v. Hoffman-La Roche Inc.*, 1997 WL 654637, at *3 (S.D.N.Y. Oct. 21, 1997) ("Plaintiff's argument that . . . New Jersey is an inconvenient forum for her present counsel, is not sustainable. The case should be assigned to the District Court sitting in Newark and counsel can be admitted pro hac vice."); *United States v. Williams*, 437 F. Supp. 1047, 1051 (W.D.N.Y. 1977) ("The mere fact that it would be more convenient for defendant to have the case tried in the district in which he resides and in which his

counsel are located is insufficient to support a change of venue."). Accordingly, this factor is neutral.

**(v) Locus of Operative Facts**

As discussed above, although the case in support is not overwhelming, the operative facts arguably center on New York. *See irth Sols., LLC*, 2019 WL 283831 at *5. Had Quinn not allegedly misappropriated trade secrets located on plaintiff's computer server in East Syracuse, New York, this suit would not exist. *See id.* ("'[T]his is thus one of those unusual cases in which it is not clear that the claim arose in any one district' and [] plaintiff c[an] choose among districts with equal plausibility in terms of venue[.]") (citing *Constr. Tech., Inc. v. Lockformer Co.*, 704 F. Supp. 1212, 1215 (S.D.N.Y. 1989)).

**(vi) Availability of Process to Compel the Attendance of Unwilling Witnesses**

There is no indication that any non-party witnesses would refuse to appear and, thus, this factor is neutral. *See, e.g.*, *Andrews v. A.C. Roman & Assocs., Inc.*, 914 F. Supp. 2d 230, 241 (N.D.N.Y. 2012).

**(vii) Relative Means of the Parties**

"In determining whether the relative means of the parties weighs in favor of transfer, 'a court should determine whether a party's financial situation would meaningfully impede its ability to litigate this case in either forum.'" *Burke v. Bimbo Bakeries USA, Inc.*, 2020 WL 4597319, at *7 (N.D.N.Y. May 14, 2020) (quoting *AIG Fin. Prods. Corp. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 675 F. Supp. 2d 354, 371 (S.D.N.Y. 2009)).

Yet "where proof of such disparity is not adequately provided, or does not exist, this is not a significant factor to be considered." *Burke*, 2020 WL 4597319, at *7 (quoting *Am. Eagle Outfitters, Inc. v. Tala Bros. Corp.*, 457 F. Supp. 2d 474, 478 (S.D.N.Y. 2006)).

Neither party has provided any evidence that their financial situation would meaningfully impede their ability to litigate this matter in this district or in the Central District of California. Thus, this factor is neutral.

**(viii) Balancing the Factors**

Defendants note that "[t]his case *could* have been brought in the Central District of California[.]" Defs.' Mot. at 18 (emphasis added). They surmise that "all the alleged substantial events and omissions took place" in the Central District of California.[5] *Id.*

Here too, defendants offer a list of disconnected facts in lieu of argument or a weighing of the relevant transfer factors:

> [A]s previously stated throughout, Quinn's domicile is in California and ARM is both headquartered and incorporated in California. [Q]uinn performed nearly all of his employment duties for SGS from his home office in California. Quinn never physically serviced New York customers[.] All of the alleged misconduct occurred while Quinn was physically located in California and in coordination with a company (ARM) that is headquartered in California.
>
> Additionally, the claims do not . . . relate to . . . the solitary New York client Quinn serviced. Furthermore, 90% of Quinn's clients while working for SGS were located in California. Any information that was allegedly accessed was downloaded from Quinn's home office in California. [A]ny work[-]related information that Quinn had downloaded through the use of a USB drive, was used to transfer the information on to his tablet for ease of access while traveling in California. More importantly, all information that Quinn had previously used while employed by SGS has been destroyed or lost.

Defs.' Mot. at 19 (internal citations omitted).

Seemingly based off these facts alone, defendants conclude, "Therefore[,] transfer to the Central District of California is warranted under 28 U.S.C. § 1404(a) 'for the convenience of parties and witnesses' and 'in the interest of justice.'" Defs.' Mot. at 19–20.

---

[5] Defendants also state that "the Central District of California [is] where the *Plaintiff* resides[.]" Defs.' Mot., Dkt. No. 12-1 at 18 (emphasis added). The Court assumes this is a scrivener's error. Although the Record reflects that defendants reside in that district, there is no indication that SGS North America resides anywhere in California.

Having undertaken the analysis that defendants skirt, the Court finds no meaningful indication that transfer is warranted. Therefore, the Court, in its discretion, finds that the factors weigh against transfer to the Central District of California, and it denies defendants' motion to transfer pursuant to Section 1404(a).

**D. Defendants' Motion to Dismiss under Rule 12(b)(6)**

Defendants' remaining motion is for dismissal of plaintiff's claims under Rule 12(b)(6). *See* Defs.' Mot. at 7, 20–27. Because the Court lacks personal jurisdiction over the Arm Group, it will not address the merits of plaintiff's claims against the corporation. Consequently, the Court's analysis will focus on the claims against Quinn.

**(1) Breach of Contract**

"[T]o plead a cause of action for breach of contract, a plaintiff usually must allege that: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (N.Y. 2022) (cleaned up); *see also Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (Cal. 2011) ("[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff.").

Plaintiff alleges that Quinn breached two provisions of the operative Restrictive Covenant and Confidentiality Agreement ("RCCA"): Section 1(e) and Section 1(f).

*(i) Section 1(e)*

Plaintiff alleges that "when Quinn failed to return SGS's confidential information following termination of his employment, he breached Sec. 1(e) of the RCCA." Compl. ¶ 76.

Under Section 1(e) of the Agreement: "[The] Employee . . . agrees that all contact information of and all communications (including emails, text messages, and other private electronic messages) with the Company's customers, prospective customers and vendors that Employee may come to possess during Employee's employment . . . shall remain the sole property of the Company[,] and Employee shall not take and fail to return such information after termination of Employee's employment with the Company for any reason." RCCA § 1(e).

Section 1(e) requires the return of any communications with plaintiff's customers, prospective customers, and vendors as well as their contact information. However, Section 1(e) does not mandate the return of amorphous "confidential information." Plaintiff identifies no communications with its customers, prospective customers, or vendors that it believes Quinn "took" or failed to return.

However, plaintiff identifies a document titled "Updated.Address.2.7.25.csv," which it says "appears to contain contact information for Amazon," one of plaintiff's "key clients." Compl. ¶ 38. Plaintiff further alleges that on February 10, 2025, Quinn downloaded this document, alongside others, onto a USB drive, and that Quinn has not returned this USB device to SGS after his employment ended. *See id.* ¶¶ 36–39. Thus, plaintiff has sufficiently alleged that Quinn breached RCCA § 1(e).

*(ii) Section 1(f)*

Section 1(f) of the RCCA " strictly prohibit[s]" an employee "from forwarding from Employee's Company email account to Employee's personal email account(s) any emails or

documents containing any Company Trade Secrets and/or Confidential Information[.]" RCCA § 1(f). Section 1(f) also prohibits "removing from the premises of the Company any physical item or document, or any written, electronic or recorded copy of any physical item or document, containing or embodying any Company Trade Secrets and/or Confidential Information[.]" *Id.*

Defendants' argument for dismissing the breach of contract claim against Quinn wields an *ipse dixit* to attack a strawman.

First, defendants declare the RCCA—apparently in its entirety—to be a "non-solicitation / non-compete provision." *See, e.g.*, Defs.' Mot. at 23. Then, defendants note that "[u]nder California Business & Professions Code § 16600, 'every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.'" *Id.* at 24 (quoting Cal. Bus. & Prof. Code § 16600). Combining the two, defendants arrive at the following: "Because § 16600 renders the non-solicitation covenant legally invalid, Plaintiff cannot plausibly allege a breach [of contract] based on such a provision." *Id.* at 25.

In one fell swoop, defendants simply pronounce the RCCA "void and unenforceable" under California law, and, therefore, SGS's complaint fails to state a claim—not just for breach of contract, but any claim. *See* Defs.' Mot. at 24–27.

Even assuming momentarily that California law applies to plaintiff's common law claims, defendants' assertion lacks merit; a bare legal conclusion is not an argument, let alone an availing one. Defendants fail to explain how California Business & Professions Code § 16600 renders invalid plaintiff's claims that Quinn—allegedly without plaintiff's authorization and in violation of the RCCA—sent plaintiff's trade secrets and confidential information to his personal email account, removed from plaintiff's premises copies of such information, and then misappropriated such information for defendants' own business ventures. *See* Pl.'s Resp. at 24 ("There is no

mention anywhere in the Complaint of a non-solicitation or non-compete provision[;] [t]o the contrary, SGS brought its breach of contract claim to enforce only the confidentiality provisions in Mr. Quinn's contract.") (citing RCCA, Dkt. No. 1-1 §§ 1(e), 1(f)).

Moreover, "[a]s a general matter, under California law, 'agreements designed to protect an employer's proprietary information do not violate section 16600.'" *W. Air Charter, Inc. v. Schembari*, 2017 WL 10638759, at *8 (C.D. Cal. Oct. 6, 2017) (quoting *Fowler v. Varian Assocs., Inc.*, 196 Cal. App. 3d 34, 44 (Cal. Ct. App. 1987)). "[R]estrictions that serve to protect a former employer's trade secrets, proprietary information, and confidential information are valid in California." *Latona v. Aetna U.S. Healthcare Inc.*, 82 F. Supp. 2d 1089, 1096 (C.D. Cal. 1999). "Therefore, provisions 'necessary to protect an employer's trade secret' are enforceable despite section 16600." *W. Air Charter, Inc.*, 2017 WL 10638759, at *8 (quoting *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 758 (9th Cir. 2008)). Sections 1(e) and 1(f) of the RCCA are both provisions intended to protect plaintiff's proprietary information.

Accordingly, the Court concludes that plaintiff has plausibly alleged a breach of contract claim against Quinn. Defendants' motion to dismiss plaintiff's breach of contract claim ("Count II") is denied.

**(2) Breach of Fiduciary Duty**

"A claim for '[b]reach of fiduciary duty requires (1) the existence of a fiduciary duty owed by the defendant; (2) a breach of that duty; and (3) resulting damages.'" *Generation Next Fashions Ltd. v. JP Morgan Chase Bank, NA.*, 698 F. Supp. 3d 663, 677 (S.D.N.Y. 2023) (quoting *Jones v. Voskresenskaya*, 125 A.D.3d 532, 533 (1st Dep't 2015)); *Golden v. O'Melveny & Myers LLP*, 2019 WL 5693760, at *16 (C.D. Cal. Nov. 1, 2019) (same) (citing *Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1086 (Cal. Ct. App. 1995)).

"[A]n employee owes a duty of good faith and loyalty to his employer." *Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 92 (S.D.N.Y. 2022) (quoting *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 659 (S.D.N.Y. 2005)); *Otsuka v. Polo Ralph Lauren Corp.*, 2007 WL 3342721, at *3 (N.D. Cal. Nov. 9, 2007) (same). "Breach of that duty of loyalty is actionable as a breach of fiduciary duty." *Garvey*, 634 F. Supp. 3d at 92.

"The duty of loyalty [is violated in] cases where the employee, acting as the agent of the employer, unfairly competes with his employer, [or] diverts business opportunities to himself or others to the financial detriment of the employer." *Garvey*, 634 F. Supp. 3d at 92 (quoting *Farricker v. Penson Dev., Inc.*, 2010 WL 845983, at *2 (S.D.N.Y. Mar. 4, 2010)); s*ee also James v. Childtime Childcare, Inc.*, 2007 WL 1589543, at *3 (E.D. Cal. June 1, 2007) ("California law recognizes a duty of loyalty that is breached when an employee takes action against an employer's best interests[,] [and] [t]he Ninth Circuit has described the duty of loyalty as a 'fiduciary-like' duty.") (internal citations omitted).

The single purported "example" plaintiff offers in support of this claim is as follows:

> [B]efore he was employed by SGS, Quinn formed a competing company—the Arm Group. Quinn never revealed the existence of the Arm Group to SGS. While he was employed by SGS, Quinn worked to favor the interests of the Arm Group over those of his employer.
>
> [. . .]
>
> Quinn hid from SGS that he had previously created a competing company and sought to benefit his own company while employed by and receiving remuneration from SGS.

Compl. ¶¶ 83, 87.

"An employee may create a competing business prior to leaving her or his employer without breaching any fiduciary duty unless she or he makes improper use of the employer's time, facilities or proprietary secrets in doing so." *Espire Ads LLC v. TAPP Influencers Corp.*, 655 F.

Supp. 3d 223, 266 (S.D.N.Y. 2023) (quoting *Island Sports Physical Therapy v. Burns*, 84 A.D.3d 878, 878 (2d Dep't 2011)).

If an employee may start a competing business during their employment without breaching a fiduciary duty, then surely they may do so before ever being hired by that employer. To the extent that this claim is premised on Quinn's creation of the Arm Group prior to his employment with SGS, it lacks merit: "[T]here can be no claim for breach of fiduciary duty unless a fiduciary relationship existed *prior* to the transaction giving rise to the alleged wrong." *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 299 (S.D.N.Y. 2012), *rev'd in part on other grounds,* 2012 WL 11896326 (S.D.N.Y. Sept. 28, 2012).

Plaintiff further asserts that Quinn "hid" and "never revealed the existence" of the Arm Group to SGS. But plaintiff does not plausibly allege that Quinn had any duty to disclose this information to it. *Cf. Severstal Wheeling Inc. v. WPN Corp.*, 809 F. Supp. 2d 245, 254 (S.D.N.Y. 2011) ("[A] mere failure to disclose does not by itself constitute a breach of a fiduciary duty."), *aff'd sub nom. Severstal Wheeling, Inc. v. WHX Corp.*, 659 F. App'x 28 (2d Cir. 2016).

Moreover, although plaintiff claims this cause of action "is not predicated on the misappropriation or theft of [SGS's] information," plaintiff does not allege any other actions by Quinn plausibly supporting its belief that Quinn breached a fiduciary duty. Rather, plaintiff offers the entirely conclusory, and therefore disregarded, assertion that "[w]hile he was employed by SGS, Quinn worked to favor the interests of the Arm Group over those of his employer." Compl. ¶ 84.

If any action by Quinn alleged in the Complaint supports plaintiff's claim, plaintiff leaves it to the Court to ascertain which. *See* Compl. ¶ 12 (asserting Quinn breached his duty of loyalty "as further alleged below"); *id.* ¶ 83 (professing plaintiff demonstrated Quinn's breach "through the actions set forth [in the twenty pages] above"). Unfortunately, the burden is squarely upon

plaintiff to succinctly state its claim. "[I]t is neither Defendants' nor the Court's duty to 'sift through the [c]omplaint and guess which factual allegations support which claims.'" *Washburn v. Kingsborough Cmty. Coll.*, 2022 WL 843733, at *2 (E.D.N.Y. Mar. 22, 2022) (quoting *Infanti v. Scharpf*, 2008 WL 2397607, at *2 (E.D.N.Y. June 10, 2008) (internal quotation marks and citation omitted)).

The Court concludes that plaintiff has failed to state a claim for breach of fiduciary duty. Accordingly, plaintiff's breach of fiduciary duty claim ("Count III") is dismissed.

**(3) Defend Trade Secrets Act ("DTSA")**

Lastly, the Court turns to the claim serving, predominately, as the foundation for this suit. Plaintiff alleges violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, based on Quinn's alleged misappropriation of plaintiff's trade secrets.

*(i) Trade Secrets*

The Defend Trade Secrets Act "provides a private right of action for '[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 419 (S.D.N.Y. 2021) (quoting 18 U.S.C. § 1836(b)(1)).[6] "To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plausibly allege that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *Quanzhou New Hunter Bags & Luggages (Light Indus.) Co. v. Spray Moret, LLC*, 2026 WL 538578, at *2 (S.D.N.Y. Feb. 26, 2026) (quoting *TRB Acquisitions LLC v. Yedid*, 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021)).

[6] Neither party appears to dispute that the "interstate or foreign commerce" element is satisfied here.

"The DTSA defines 'trade secret' to include 'all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes,' so long as: (1) 'the owner thereof has taken reasonable measures to keep such information secret' and (2) 'the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" *Better Holdco, Inc.*, 666 F. Supp. 3d at 384 (quoting 18 U.S.C. § 1839(3)).

In essence, "[a] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design[,] and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 48 (2d Cir. 2018) (summary order) (quoting *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990)).

*(ii) Misappropriation*

Under the DTSA, the term "misappropriation" means:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who--
>
>> (i) used improper means to acquire knowledge of the trade secret;
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
>>
>>> (I) derived from or through a person who had used improper means to acquire the trade secret;

> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (iii) before a material change of the position of the person, knew or had reason to know that--
>
> (I) the trade secret was a trade secret; and
>
> (II) knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5).

"Improper means," as defined by the DTSA, "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition[.]" 18 U.S.C. § 1839(6).

*(iii) Sufficient Specificity*

What qualifies as a "trade secret" under the DTSA is wide-ranging. Even so, under the DTSA, "a claimant bears the burden of identifying a purported trade secret with sufficient specificity." *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 800–01 (2d Cir. 2023) (internal citations omitted).

"The specificity requirement 'place[s] a defendant on notice of the bases for the claim being made against it,' and allows a factfinder to determine whether certain information is, in fact, a trade secret." *Syntel Sterling Best Shores Mauritius Limited*, 68 F.4th at 801 (quoting *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021)).

The Second Circuit has not defined this requirement. *See Syntel Sterling Best Shores Mauritius Limited*, 68 F.4th at 801 n.9 (acknowledging that the Circuit has previously "not squarely

articulated the precise contours of the specificity requirement in the context of trade secrets," and declining to do so there) (quoting *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 49 n.3 (2d Cir. 2018) (summary order)). That is due, in part, to the fact that "[t]he existence of a trade secret, including whether it was adequately identified, is 'a fact-specific question to be decided on a case-by-case basis.'" *Id.* at 801 (quoting *Oakwood Laboratories LLC*, 999 F.3d at 906); *see also id.* ("An exact definition of a trade secret is not possible.") (quoting *Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir. 1962)).

Consequently, the Court must examine plaintiff's Complaint to see whether it identifies any trade secret with sufficient specificity.

*(iv) Analysis*

The allegations in plaintiff's DTSA claim ("Count I") are brought largely in Paragraph 61 of the Complaint, which also contains subparagraphs (a) through (g) as follows:

> 61. [] Quinn misappropriated at least the following trade secrets:
>
> a. Confidential data that SGS compiled into a technical presentation. *See supra* at Paragraph 46(a) (referencing a document titled "Escape methane market.8.12.24.pdf" that is not shared with the public and that Quinn emailed from his SGS account to his Arm Group account on August 12, 2024).
>
> b. Intelligence developed by SGS to assess markets for their products and drive sales strategy. *See supra* at Paragraph 46(b) (referencing document titled "Simple Market Analysis" that Quinn emailed from his SGS account to his Arm Group account on August 12, 2024).
>
> c. Confidential information from SGS's customer relationship management platform, used to track the needs and contact information of SGS's customers. *See supra* at Paragraph 46(c) (referencing a document titled "Document1.docx" that Quinn emailed from his SGS account to his Arm Group account on August 13, 2024).
>
> d. Confidential notes from a meeting with a strategic partner of SGS. *See supra* at Paragraph 46(d) (referencing a document titled "NevadaNano.Slides.docx." that Quinn emailed from his SGS account to his Arm Group account on August 22, 2024).

e. Confidential information related to SGS's SmartSense technology. *See supra* at Paragraph 46(h) (referencing a downloaded document titled SmartSense.Monitor.jpg and emailed photos of a SmartSense sensor showing details of its interior components).

f. Compilations of pricing data, purchase orders, and updated contact information for SGS's key client Amazon that Quinn downloaded on January 13, 2025 and February 10, 2025. *See supra* at Paragraphs 38-40 (referencing files titled "Amazon POs" and "2025 Amazon Pricing Matrix - AUS.xlsx" and "Updated.Address.2.7.25.csv").

g. Nonpublic client lists with nonpublic pricing data, including notes on SGS's client sites indicating which were not serviced by Quinn's company. *See supra* at Paragraph 43 (referencing the Excel-based file Quinn created titled "Project_Sequoia_Site_List (12.20)(1).xlsx").

Compl. ¶ 61.

This language quoted above is prolixity masquerading as detail and specificity.

Plaintiff uses "*see supra*" in Paragraph 61(a) through 61(f) of Count I. The Court is unsure what to make of this drafting choice. If plaintiff believes that the documents these signals reference constitute trade secrets, it stands to reason that plaintiff would state so explicitly. That plaintiff does not do so suggests an attempt to distract from the lack of specificity provided in the text of Count I.

Divorced from the internal cross-references redirecting the Court to earlier parts of the Complaint, Paragraph 61 asserts that Quinn misappropriated the following "trade secrets": (a) "confidential data," (b) "intelligence," (c) "confidential information," (d) "confidential notes," (e) more "confidential information," (f) Amazon "pricing data, purchase orders, and []contact information," and (g) unspecified "client lists with [] pricing data."

Even considering the internal cross-references, most do little more than add superfluous details, such as file names, as if such invocation will transform plaintiff's vague assertions of

confidential[7] "data," "intelligence," "notes," "information," and "lists" into trade secrets. Worse still, most of the Complaint paragraphs that plaintiff cites in Count I as providing the factual foundation for its DTSA claim do not contain the support that plaintiff implies they do.

For instance, plaintiff asserts that Quinn misappropriated its "trade secret" of "confidential data that SGS compiled into a technical presentation," directing the Court to "*see supra* at Paragraph 46(a)" which "referenc[es] a document titled 'Escape methane market.8.12.24.pdf'[.]" Compl. ¶ 61(a). Paragraph 46(a) states only that "Escape methane market.8.12.24.pdf . . . is [a] technical presentation related to the market for air quality monitoring." *Id.* ¶ 46(a).

The addendum—"related to the market for air quality monitoring"—provides no useful elaboration or specificity. Plaintiff works in the "air quality business" and alleges that defendants endeavor to be its "direct competitor . . . in the field of air quality monitoring." Compl. ¶¶ 3, 56, 57. So the "technical presentation" is "related to" the "market" of the business field plaintiff occupies. This tells the Court nothing.

More importantly, as pleaded, it is unclear that the "technical presentation" is even germane to plaintiff's DTSA claim. Plaintiff alleges that "Quinn misappropriated . . . the following trade

[7] Throughout the Complaint, plaintiff employs the phrase "misappropriation of [] trade secrets *and confidential information*," rarely referring to one without the other. *See, e.g.*, Compl. ¶ 4 ("while employed at SGS, Quinn misappropriate SGS's trade secrets and other confidential information related to . . . "); *id.* ¶ 26 ("SGS utilizes such trade secrets and other confidential information to . . ."); *id.* ¶ 28 ("Individuals employed by SGS who are engaged in sales, especially those with access to SGS's trade secrets and other confidential information accessible on their internal systems—such as Quinn—become intimately knowledgeable of SGS's products, business, transactional data regarding customers, and SGS's cost and profit margins for each client."); *id.* ¶ 29 ("SGS trade secrets and confidential information have significant economic value to its competitors."); *id.* ¶ 31 ("At all relevant times, SGS has taken extensive and reasonable steps to protect the confidentiality of its trade secrets and confidential information."); *id.* ¶ 33 ("On information and belief, one of Quinn's purposes in accepting the position of Senior Product Manager at SGS was to gain access to SGS's trade secrets and other confidential information . . ."); *id.* ¶ 34 ("[E]xamination revealed that Quinn, in contravention of his contractual obligations, had connected various USB devices to his SGS laptop computer and transferred onto these devices SGS's trade secrets and other confidential information."); *id.* ¶ 45 ("These emails contained or attached SGS's trade secrets and other confidential information."). But mere "confidential information" is not protected by the DTSA—only trade secrets. *See, e.g.*, *Converged Compliance Sols., Inc. v. XOP Networks, Inc.*, 2024 WL 4665114, at *9 (S.D.N.Y. Sept. 25, 2024) ("Nor does the vague list of documents provided by Plaintiff identify a trade secret[.] Plaintiff has failed to plead which of these 'numerous categories of documents they describe in their complaint are trade secrets—as opposed to mere confidential or proprietary information.'") (internal citations omitted).

secret[:] Confidential data that SGS compiled into a technical presentation." Compl. ¶ 61. Plaintiff does not say in the cross-referenced Paragraph 46(a) that the "technical presentation" itself is a trade secret. Nor does it say so in Paragraph 61(a). As written, the "trade secret" at issue in Paragraph 61(a) is "confidential data." But, again, the DTSA does not defend merely "confidential" information. Just because the underlying data used to create the presentation was "confidential," that does not, absent more, make the presentation itself (i.e., the PDF) "confidential," let alone a protectable trade secret.

Plaintiff also asserts that Quinn misappropriated its "trade secret" of "confidential information from [its] customer relationship management platform," directing the Court to "*see supra* at Paragraph 46(c)" which "referenc[es] a document titled 'Document1.docx'[.]" Compl. ¶ 61(c). Yet Paragraph 46(c) states only that "Document1.docx" is "a screenshot from [that] platform[.]" *Id.* ¶ 46(c). Here, too, plaintiff provides tangential information to disguise the lack of necessary detail. Describing Document1.docx as a screenshot from plaintiff's platform says nothing about what the screenshot has captured. Plaintiff states only that the "trade secret" discussed in Paragraph 61(c) is "confidential information."

The pattern continues. In Paragraph 61(d), plaintiff asserts that Quinn misappropriated its "trade secret" of "confidential notes from a meeting with a strategic partner of SGS," directing the Court to "*see supra* at Paragraph 46(d)" which "referenc[es] a document titled 'NevadaNano.Slides.docx.'" Compl. ¶ 61(d). Paragraph 46(d) alleges that Quinn emailed himself the document "NevadaNano.Slides.docx," which "contains screenshots from an SGS meeting with . . . an SGS partner." *Id.* ¶ 46(d). Plaintiff again leaves the Court to guess what the trade secret at issue is supposed to be: Are the "confidential notes" the "NevadaNano.Slides.docx" document, the

screenshots within the document, or something else entirely? Whichever it is, plaintiff does not sufficiently state a trade secret.

Similarly, plaintiff asserts that Quinn misappropriated its "trade secret" of "confidential information *related to* SGS's SmartSense technology," directing the Court to "*see supra* at Paragraph 46(h)" which "referenc[es] a downloaded document titled SmartSense.Monitor.jpg and emailed photos of a SmartSense sensor showing details of its interior components." Compl. ¶ 61(e) (emphasis added). Yet Paragraph 46(h), much like the rest of the Complaint, makes no mention of a document named "SmartSense.Monitor.jpg." It states only that Quinn emailed himself "attachments titled 'heating element 1.jpg,' 'heating element2.jpg,' [and] 'heating element 3.jpg" and that "[t]hese are photos of SGS's SmartSense sensor showing details of its interior components." *Id.* ¶ 46(h). Plaintiff does not allege that these heating element photos contain or constitute trade secrets. In other words, as pleaded, Paragraph 46(h) bears no relation to the DTSA claim. Thus, the Court is left only with plaintiff's assertion that there is some other unidentified "information related to SGS's SmartSense technology" that is a protectable trade secret.

Paragraph 61(f) would, as plaintiff might say, "appear" to be the closest the Complaint gets to alleging a trade secret with sufficient specificity. Plaintiff asserts that Quinn misappropriated its trade secret of "compilations of pricing data, purchase orders, and updated contact information for SGS's key client Amazon that Quinn downloaded on January 13, 2025, and February 10, 2025," directing the Court to "*see supra* at Paragraphs 38–40" which "referenc[e] files titled 'Amazon POs' and '2025 Amazon Pricing Matrix - AUS.xlsx' and 'Updated.Address.2.7.25.csv.'" Compl. ¶ 61(f).

First, "Amazon POs" is a folder that "existed within Quinn's user profile on SGS's systems." Compl. ¶ 40. Plaintiff's "forensic examination of Quinn's SGS laptop" revealed that the

Amazon POs folder "contained nine Amazon Purchase orders that were all downloaded by Quinn on January 13, 2025." *Id.* According to plaintiff, the "Amazon POs" folder "no longer exists and was not recoverable from previously existing data." *Id.*

Plaintiff makes no other reference to the folder. Stated differently, Paragraph 40 says only that Quinn, during his employment, created a folder titled "Amazon POs" on his work computer, put some documents into that folder, and that the folder has since been deleted. Even if those purchase orders somehow were or contained trade secrets, based on plaintiff's Complaint, there is no indication or allegation that they left Quinn's work computer (i.e., that they were ever misappropriated under the DTSA).

As for the "2025 Amazon Pricing Matrix.AUS.xlsx" file, plaintiff provides only two facts: (1) the document was created on January 30, 2025, and (2) it "*appears* to contain pricing data for Amazon." Compl. ¶ 38 (emphasis added). The same is true with respect to the "Updated.Address.2.7.25.csv"—plaintiff states only two facts: (1) the document was created on February 7, 2025, and (2) it "*appears* to contain contact information for Amazon." *Id.* (emphasis added).

"To survive a motion to dismiss under Rule 12(b)(6), 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Nat'l Retail Fed'n v. James*, 806 F. Supp. 3d 427, 433 (S.D.N.Y. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[C]onclusory or speculative assertions are not to be taken as true." *Id.*

If plaintiff can offer nothing more than sheer speculation about the contents of "2025 Amazon Pricing Matrix.AUS.xlsx" and "Updated.Address.2.7.25.csv," then any contention that the files contain plaintiff's trade secrets, or that the files are plaintiff's trade secrets, is entirely conclusory and cannot provide a basis for DTSA claim.

As for Paragraph 61(g), plaintiff asserts that Quinn misappropriated its "trade secret" of "nonpublic client lists with nonpublic pricing data, including notes on SGS's client sites indicating which were not serviced by Quinn's company," directing the Court to "*see supra* at Paragraph 43" which "referenc[es] the Excel-based file Quinn created titled "Project_Sequoia_Site_List (12.20)(1).xlsx")." Compl. ¶ 61(g). Paragraph 43 states that at some undated point during the seven years Quinn worked for plaintiff, he created that file. "Project_Sequoia_Site_List(12.20)(1).xlsx [] was a spreadsheet containing an SGS client list, along with pricing information for each client." *Id.* ¶ 43.

Even assuming that "Project_Sequoia_Site_List(12.20)(1).xlsx" is or contains a sufficiently-specified trade secret, plaintiff fails to plausibly allege that Quinn misappropriated that trade secret. Plaintiff alleges only that, "*on information and belief*, Quinn transferred this file from his SGS laptop computer to his own control prior to his termination by SGS." Compl. ¶ 44 (emphasis added). But "[a] litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018).

"Those magic words will only make otherwise unsupported claims plausible when 'the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.'" *Citizens United*, 882 F.3d at 384–85 (quoting *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)). As detailed in the Complaint, plaintiff conducted a thorough forensic examination of Quinn's company-issued laptop and his company email account. Plaintiff's examination of the laptop turned up a plethora of Quinn's files, data, email messages, information regarding system architecture and his user profile, and related metadata. It also revealed metadata detailing when devices were connected to the

laptop and what information those devices collected from the laptop. Put simply, there is no basis for plaintiff to plausibly allege merely "upon information and belief" that a file was transferred off Quinn's company-issued laptop.

The Court's analysis of the DTSA claim should come as no surprise to plaintiff. When pressed by the Court at oral argument to identify where exactly the Complaint identifies any trade secret, plaintiff could not do so. For the most part, plaintiff made vague references to unspecified technical and pricing information, lists, and analyses. Its best effort entailed pointing the Court to Paragraph 61(b). But Paragraph 61(b) is as unavailing as the other paragraphs that the Court has already covered.

Paragraph 61(b) asserts that Quinn misappropriated the "trade secret" of "[i]ntelligence developed by SGS to assess markets []and drive sales strategy," and directs the Court to "*see supra* at Paragraph 46(b)" which "referenc[es] a document titled 'Simple Market Analysis.'" Compl. ¶ 61(b). Yet Paragraph 46(b) provides only that Quinn emailed himself "a document titled 'Simple Market Analysis' [which] *appears* to contain intelligence developed by SGS to assess markets for its products and drive sales strategy." *Id.* ¶ 46(b) (emphasis added). Setting aside Paragraph 61(b)'s lack of specificity regarding this purportedly DTSA-protectable "intelligence," plaintiff's factual allegations are insufficient. Again, plaintiff does not even allege that this "intelligence" is a trade secret; it alleges only that it might be.

The Court has considered plaintiff's other bases for its DTSA claim. Without further hazarding through the labyrinth that is plaintiff's Complaint, the Court finds these bases similarly lacking. Accordingly, plaintiff's DTSA claim ("Count I") is dismissed.

## IV. CONCLUSION

Therefore, it is

**ORDERED** that

1. Defendants' motion to dismiss for improper venue (Dkt. No. 12) is **DENIED**;
2. Defendants' motion to transfer venue (Dkt. No. 12) is **DENIED**;
3. Insofar as Defendants' motion (Dkt. No. 12) can be construed as a motion to dismiss based on the first-filed rule, the motion is **DENIED**;
4. Defendant Timothy Quinn's motion to dismiss for lack of personal jurisdiction (Dkt. No. 12) is **DENIED**;
5. Defendant Arm Group's motion to dismiss for lack of personal jurisdiction (Dkt. No. 12) is **GRANTED**, and the Arm Group is **DISMISSED** from this action;
6. Defendants Does 1 through 10 are **DISMISSED** from this action;
7. Plaintiff's claims for misappropriation under the Defend Trade Secrets Act ("Count I"), Breach of the Duty of Loyalty ("Count III"), Aiding and Abetting Breach of the Duty of Loyalty ("Count IV"), and Tortious Interference with Contract ("Count V") are **DISMISSED** without prejudice;
8. Plaintiff's claim for Breach of Contract ("Count II") survives; and
9. Defendant Timothy Quinn shall answer Plaintiff's Complaint within fourteen (14) days of this Decision & Order.

**SO ORDERED.**

Dated: September 29, 2026
Utica, New York.

Anthony J. Brindisi
U.S. District Judge